Argued October 29, 1957, reversed and remanded February 5, 1958

# PORT OF UMATILLA *v.* RICHMOND ET AL

321 P. 2d 338

*George H. Corey,* of Pendleton, argued the cause and filed a brief for appellant.

*John F. Kilkenny* and *John H. Kottkamp,* of Pendleton, argued the cause for respondents. With them on the brief were Kilkenny & Fabre, of Pendleton, and Charles L. Powell, of Kennewick, Washington.

Thomas J. White of Portland, filed a brief as amicus curiae for the Oregon State Public Port Authorities Association.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

BRAND, J.

This is an action brought by the Port of Umatilla to condemn approximately 168 acres of land belonging to the defendants Richmond. The trial court gave judgment for the defendants and dismissed the action. Plaintiff appeals.

The complaint is in the usual form. Paragraph "VI" thereof reads as follows:

"For the development of port facilities, wharves, dock frontage, harbor improvements, storage facilities, cargo handling facilities and for the exercising, carrying out and executing of the powers provided by law for a port, it is necessary and convenient that plaintiff acquire the real property described in Paragraph V hereof. Prior to the commencement of this action the plaintiff by resolution found and declared that said real property was and is needed, required and deemed necessary and convenient for such purposes."

In their further and separate answer defendants allege in part:

"\* \* \* that the venture mentioned and described in said amended complaint is entirely new; that the plaintiff is attempting to exercise its right of eminent domain in connection with such property on an acreage far in excess of any acreage which can be used for port facilities at the present time or in the foreseeable future; that an area of land not in excess of 15 acres is sufficient for any port facilities now required or to be required by the said Port Commission in the foreseeable future; that the plaintiff is attempting to condemn and acquire such real property for the purpose of selling and leasing such real property to private investors who may come into the area; that defendants acquired title to such property for the express purpose of holding such property for sale and lease to private industry; that the plaintiff, in passing a resolution for the acquisition of such large tract of land, abused its discretion, in that there is no necessity therefor and said plaintiff has no constitutional right or authority to acquire real property for private purposes or for the purpose of conveying the same to private persons, firms or corporations."

The reply was a general denial.

The cause was tried by the court without a jury. At the commencement of the trial the court said: "As I understand it, the only question that is to be determined in this case is the necessity for taking." Counsel for the parties agreed that such was the issue. After a long trial the court rendered a written opinion and entered judgment dismissing the action. No separate findings of fact appear in the record. However, we quote the following from the judgment:

"The Court finds in favor of the defendants Richmond and against the plaintiff on the issues

of fact involved in this cause and finds that plaintiff in this cause is attempting to condemn an area of property far in excess of its needs for public purposes and that a large portion of the property sought to be condemned is to be used for other than public purposes and on the other hand, is to be used to attract private industry to such area."

From the brief of the Port we quote:

"* * * Essentially, the principal question here is whether a municipal port in Oregon may acquire land by eminent domain and lease the same for an industrial site. If this question is answered in the negative, the Port contends further that the record shows that the purpose of leasing was in any event incidental to the main purpose of port facility construction and that the acquisition is valid."

The issues in this case are presented by four assignments of error, all of which raise the same question. Error is claimed in the denial of plaintiff's motion for judgment on the ground that the resolution of the Board of Port Commissioners "proves the prima facie case of necessity and the defendant has failed to offer any evidence or failed to show at all that there was any abuse."

The failure of the court to sustain plaintiff's objections to the proposed findings and judgment, the refusal to sign those proposed by plaintiffs, the denial of plaintiff's motion for judgment notwithstanding the findings and verdict, and the denial of two motions by plaintiffs for judgment on the pleadings constitute the assignments of error. They challenge the sufficiency of the allegations concerning abuse of discretion, characterizing them as merely conclusions of law, and they challenge the sufficiency of the evidence to show any such abuse.

The Port of Umatilla was established as a district in the year 1940. With the construction of the Bonneville and McNary Dams in the great waterway, the Columbia River, the Commission determined to construct port facilities to serve river commerce between the inland areas and tidewater. On investigation and report by engineers the Commission adopted the Cold Springs site which lies a few miles upstream from the city of Umatilla. On 7 November 1955 the commissioners adopted a resolution declaring the necessity of the acquisition of the property described in the complaint. It reads in part as follows:

"WHEREAS, for the purpose of providing port facilities, wharves, dock frontage, harbor improvements, storage facilities, cargo handling facilities and for the exercising, carrying out and executing powers provided by law for a port for the purpose of serving the public, the Port of Umatilla plans and proposes to construct such facilities and to make such improvements for such purpose and to exercise, carry out and execute such powers on the real property hereinafter described, and that said real property is necessary for such purpose.

"WHEREAS, said real property has been appraised as required by law.

"NOW, THEREFORE, BE IT HEREBY RESOLVED by this Board of Commissioners, all members thereof being present and voting affirmatively, as follows:

"1. That the Board of Commissioners does hereby find and declare that there is needed and required and deemed necessary and convenient for the development of port facilities, wharves, dock frontage, harbor improvements, storage facilities, cargo handling facilities and for the exercising, carrying out and executing the powers provided by law for a port as above mentioned, the following real property in fee simple, as set forth in Exhibit

'A' attached hereto and by reference made a part of this resolution."

The defendant Umatilla County made no appearance in the case. We shall refer to R. W. Richmond and wife as "the defendants."

As we have indicated, the parties have agreed that the only question to be determined is the "necessity" for taking. No question is raised as to the right of the plaintiff to condemn some of defendants' land for the purposes set forth in the quoted resolution declaring necessity. In fact the prayer of the defendants is that the court "try out the question of the necessity for the large acreage which the plaintiff is attempting to condemn and to reduce the area of the property to be condemned to not in excess of 15 acres * * *." This of course we cannot do in this law action. Notwithstanding the agreed limitation of the issue to that of necessity, the parties have argued pro and con the question whether the land proposed to be taken is for a public use. That issue cannot be avoided because if the land is not taken for a public use it could not be said to be necessary. We shall first consider the controlling rules of law with particular reference to the issues made by the pleadings and then will consider issues which arise on the evidence. It will be noted that the purposes for which the land is desired by the Port are specified in paragraph VI of the complaint which is set forth verbatim supra. The defendants allege that plaintiff is attempting to condemn the land "for the purpose of selling and leasing * * * to private investors." The reply denies that allegation.

We shall first consider the constitutional limitations upon the taking of private property by condem-

nation. The Constitution provides: "Private property shall not be taken for public use * * * without just compensation." Constitution of Oregon, Article I, Section 18. Amendments adopted in 1920 and 1924 illustrate the liberalizing of the concept of public use to include uses which would otherwise have been deemed private. The consolidated amendments of 1920 and 1924 read as follows:

 "* * * provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use. * * *" Constitution of Oregon, Article I, Section 18.

The 1920 amendment authorizing the taking of ways for transportation of the products of mine, farm or forest resulted from an adverse holding in *Anderson v. Smith-Powers Logging Co.,* 71 Or 276, 139 P 736. See, *Smith v. Cameron,* 106 Or 1 at 8, 210 P 716 (1922). The 1924 amendment which included the taking of water for beneficial use apparently resulted from the adverse holding in *Smith v. Cameron,* supra. The development of a liberalizing public policy is indicated by these constitutional amendments.

The Port of Umatilla was organized under Chapter 777, Oregon Revised Statutes. It is authorized to hold, receive and dispose of real property "and do all other acts * * * which may be requisite, necessary or convenient in carrying out the objects of the corporation or exercising the powers conferred upon it" by designated sections of the statute. ORS 777.050. Among the sections so designated are Section 777.105 authorizing construction of canals, basins and waterways, necessary or convenient for the extension of the

commerce of the port, and 777.115 which provides "the right shall include the taking of any private property under the right of eminent domain which is found necessary or convenient in carrying on any work or the exercising, carrying out and executing any power" provided in enumerated sections.

"Any port may:

"(1) Acquire, charter, own, maintain and operate steamboats, power boats, vessels and watercraft for the transportation of all kinds of merchandise, passengers and freight for hire, and engage generally in the coast-wise trade and commerce, both domestic and foreign, and in transporting for hire all kinds of merchandise and freight.

\* \* \* \* \*

"(3) Own, acquire, construct, operate and maintain railroad terminal grounds and yards, and construct, operate and maintain such line or lines of railroad, with necessary sidetrack, turnouts, switches and connection and arrangements with other common carriers, as in the judgment of the board may facilitate water commerce between such point and points within the boundaries of the port as the board may from time to time determine, all for hire.

"(4) Carry and transport freight and passengers and move passenger trains thereon and thereover for hire.

"(5) Engage generally in the business of buying and selling coal, fuel oil and all kinds of fuel for steamboats and power boats and power vessels of all kinds.

"(6) Acquire lands, construct canals and breakwaters, piers and bulkheads, maintain and operate wharves, warehouses, drydocks, power plants and power transmission lines.

"(7) Acquire or purchase, by condemnation or other lawful method, such land as it may deem necessary and lease and sell such lands.

"(8) Improve for public convenience and the convenience of its shipping and commercial interests all or any portion of the waterfront of its harbors, rivers and waterways.

\* \* \* \* \*

"(10) Construct or cause to be constructed, maintain or operate, or maintain and operate, wharves, docks, warehouses and drydocks, upon any of the waterfront so acquired by it, with full power to lease and sell the same, together with the lands upon which they are situated, whether held by the port in its governmental capacity or not; and collect from vessels using the same, wharfage, dockage, and drydockage; and collect from owners or consignees of goods passing over such docks and warehouses, wharfage and storage charges from goods so handled.

"(11) Acquire by condemnation or other lawful method, such lands or sites as, in the opinion of the board, may be suitable or necessary for the establishment of hydroelectric, steam generating, electric, oil, gasoline or other power-producing plants; make all necessary preliminary investigations, negotiate for and secure options for the purchase or lease of such sites, and sell, lease and dispose of same.

"(12) Design, erect, complete, operate and maintain all necessary hydroelectric, steam generating, electric, oil, gasoline or other power-producing systems, for the purpose of generating electrical current for lighting and power purposes.

"(13) Acquire by condemnation or other lawful method, rights of way for the placing of transmission lines over which to carry the electrical energy required between the points of origin or production and the locations where such power may be carried for distribution, and sell, lease and dispose of same; provided, that nothing contained in this section shall authorize ports to enter into the business of supplying electric energy or service, or other power service, to municipalities or to the

public, or for any purpose other than the construction or operation of docks, terminals, elevators or other shipping facilities, or in any of the work ports are authorized by law to engage in.

"(14) In general do such other acts and things as tend to promote the maritime shipping and commercial interests of the port and acquire, hold, use, enjoy and dispose of and convey real and personal property necessary or convenient in carrying out its powers." ORS 777.130.

Truly, as indicated in the heading to the foregoing section, "Ports may engage in commerce generally." Especial attention is directed to subparagraphs 7 and 14 which authorize the acquisition by condemnation of such land as it may "*deem*" necessary and which empowers a port to promote maritime and shipping interests and to acquire, use and dispose of real property necessary "*or convenient*" in carrying out its powers and to "lease" such lands.

Defendants assert that the taking of land in a condemnation proceeding for the purpose of leasing to private industry is not a taking for public use and the statute authorizing it is unconstitutional. It is not clear that we are required in this case to decide whether plaintiff may take by condemnation and then lease a part of the land taken. If leasing cannot be authorized, the words purporting to give such authority being separable would not affect the validity of the remaining provisions of the statute. Furthermore, although leasing is one of the powers of a port which is enumerated in the statute, it does not follow that the plaintiff will attempt to exercise all of the many enumerated powers granted. The resolution does not include leasing as one of the specific purposes for which the land is to be taken. We cannot say as a matter of law that leasing to industry is necessary for the purpose

of "exercising the powers provided by law" or for carrying out the purposes enumerated in the resolution. The plaintiff may never lease any land. From Nichols we quote:

"* * * Once the use is declared public however the sounder rule is for the court to refuse to look into the ulterior motives and undisclosed plans of the incorporators, and to wait until an illegal use is actually attempted before it interferes. * * *" 2 Nichols on Eminent Domain 474, § 7.4[1].

In *State v. Hawk,* 105 Or 319, 326, 208 P 709, we said:

"When the power to take private property for public use has been conferred by the legislature, it rests with the grantee to determine whether it shall be exercised, and when and to what extent it shall be exercised, provided, of course, that the power is not exceeded or abused. Courts cannot inquire into the motive which actuated the authorities, or enter into the propriety of constructing the particular improvement: 1 Lewis, Eminent Domain (3 ed.), § 370."

If the proposed condemnation can be upheld on the basis of the uses expressly approved in the resolution, the power to lease would be immaterial at this stage of the enterprise. We conclude that the right to lease is not a necessary element in the plaintiff's case, as defined by the resolution.

The situation is suggestive of a dilemma. If leasing is not a necessary element of plaintiff's case, we need not consider it. If, on the other hand, it should be held that leasing, though not officially proposed, is a necessary incident in plaintiff's case for condemnation, then since the right to condemn for the uses specified in the resolution is unquestioned, and since by such hypothesis leasing to industry is a necessary part of the plan, it would follow that leasing is author-

ized. Notwithstanding the foregoing, the plaintiff has expressly stated that the power to lease is a principal question in the case, and defendants join issue on that question. Though the resolution does not indicate any intention to lease, the brief of the Port appears to assume that leases to private interests may be necessary to facilitate the broad operations authorized by law. The evidence and the authorities cited infra show the desirability if not the necessity of leasing portions of the land to shippers and also show a practice on the part of other ports in Oregon and Washington of making such leases in direct furtherance of the principal function of the respective ports. A decision denying to Oregon ports the power to lease for any purpose whatever would have cataclysmic results. The question is of such importance that the Oregon State Public Port Authorities Association has filed a brief as amicus curiae on behalf of the public port authorities of Oregon, supporting plaintiff's position. Assuming that the Port will in the future do what it has not yet decided to do but which appears to be the intent of the individual commissioners, we will treat the issue as before us.

▮ Turning to the law of the case, we agree with counsel for defendants that the plaintiff Port cannot take private property for private use by condemnation. Constitution of Oregon, Article I, Section 18; ORS 777.115; *Smith v. Cameron,* 106 Or 1, 210 P 716 and *Anderson v. Smith-Powers Logging Co.,* 71 Or 276, 139 P 736, both supra; *Witham v. Osburn,* 4 Or 318. Again we agree that condemnation statutes are in derogation of vested rights and must be strictly construed to the extent indicated in our decisions, particularly as to procedure. *City of Portland v. Kamm,* 132 Or 317, 285 P 236. However, such statutes should

not be construed to defeat the intent and "manifest purpose of the legislature." *Seafeldt v. Port of Astoria,* 141 Or 418, 420, 16 P2d 943; *State v. Hawk,* supra, 105 Or 319, 327, 208 P 709; *Chapman v. Hood River,* 100 Or 43, 52; *Oswego D. & R. Ry. Co. v. Cobb,* 66 Or 587, 135 P 181; *United States v. Denver & Rio Grande R. Co.,* 150 US 1, 37 L Ed 975; 1 Lewis, Eminent Domain, 3d Ed, page 708, § 388; 1 Nichols on Eminent Domain 233, § 3.213[2]. The unequivocal language of the statute quoted supra gives the Port wide powers. We mention only the provisions authorizing ports to engage in commerce and to acquire by condemnation "such land as [they] may deem necessary, and lease * * * such lands." The manifest purpose of the statute is clear.

■ The question now arises: Is the statute constitutional? We have held that so long as a reasonable doubt exists a statute will not be held unconstitutional. *Smith v. Cameron,* supra. And see, *Dornan v. Philadelphia Housing Authority,* 331 Pa 209, 200 A 834, a case which is typical of the modern judicial opinion on the scope of eminent domain.

We now inquire what is a public use and who is to decide whether a particular use is public? Two different tests have been applied by the courts. In *Smith v. Cameron,* supra, 106 Or 1 at 12, this court acknowledged that:

> "It is difficult, and probably impossible, to frame such a definition of the term 'public use' employed in Constitutions as will include all adjudications where controverted uses have been held public and at the same time exclude all those uses where it has been ruled that the disputed uses were private. * * *"

But it also said:

> "* * * But upon every occasion this court has rejected the notion that 'public benefit' means 'public use' and has taken the view that 'public use,' as now employed in our state Constitution, means use by the public, and this must now be accepted as the established view of this court: * * *." 106 Or at 17.

This case announces a stricter rule than that laid down by Justice ROBERT S. BEAN in *Bridal Veil Lumbering Co. v. Johnson,* where he said that the power can be exercised only for a public use *or benefit.* We quote:

> "* * * it must be able to establish the fact that the enterprise in which it is engaged is one by which a public use or benefit is to be subserved or promoted, so that such taking can be said to be for a public and not a private use. * * *" *Bridal Veil Lumbering Co. v. Johnson,* 30 Or 205, 208, 46 P 790.

This case is cited with approval in *Coos Bay Logging Co. v. Barclay,* 159 Or 272, 293, 79 P2d 672; *MacVeagh v. Multnomah County,* 126 Or 417 at 432, 270 P 502; *Moody v. Benson,* 109 Or 414, 424, 220 P 561.

That the court in *Smith v. Cameron,* supra, did not intend to controvert the pronouncement in the Bridal Veil case is apparent from the fact that the latter case was cited in support of the quoted passage from the former. Another distinction to be noticed is that where the more strict language has been employed, the case has been one in which a private person or corporation, or at most, a public utility corporation, engaged in business for profit has been the would-be condemnor. *Smith v. Cameron*; *Anderson v. Smith-Power Logging Co.,* both supra. It may well be that public benefit accruing directly to a governmental

agency of the state should be given greater weight on the issue of public use than would be true in the case of public benefit indirectly accruing to the public because of increased prosperity incidental to private profit or expanding private business. The use by this court of the word "benefit" at least indicates that though the ultimate test is public use, we are authorized to consider public benefit as relevant to the issue when the taking is by an agency of the state having no private interest whatever.

■ When a defendant is entitled to a jury trial in a condemnation action the function of the jury is to decide only the amount of damages to be paid, or incidentally to pass upon the ownership of the land in so far as that may affect the right to compensation. 1 Nichols on Eminent Domain 361, § 4.105[5]. But what is a public use is always a question of law for judicial determination. *City of Eugene v. Johnson,* 183 Or 421, 426, 192 P2d 251; *Coos Bay Logging Co. v. Barclay,* 159 Or 272, 294, 79 P2d 672; and *State ex rel. v. Hawk,* 105 Or 319 at 326; *Anderson v. Smith-Powers Logging Co.,* 71 Or 276 at 294, both supra; *Dallas v. Hallock,* 44 Or 246, 252, 75 P 204; *Apex Transportation Co. v. Garbade,* 32 Or 582, 587, 52 P 573; *Bridal Veil Lumbering Co. v. Johnson,* supra, 30 Or 205 at 209; *Sears v. City of Akron,* 246 US 242, 62 L Ed 688; *Rindge Co. v. Los Angeles County,* 262 US 700, 67 L Ed 1186; *Atwood v. Willacy County Navigation District,* Tex Civ App, 1954, 271 SW2d 137.

The defendants cite familiar cases to the effect that the judge's findings in a law action tried without a jury have the force and effect of a jury verdict and bind this court if supported by substantial evidence. They then argue that the so-called finding in the judgment of the trial court is conclusive and requires that

the judgment be affirmed. We agree that if issues of fact which would be for determination by a jury, if there was one, are decided by the court without a jury, such decision would be binding upon us. The cases cited are of that nature, involving decision by the judge on conflicting evidence. But when the issues are of a character which would be for the determination of the judge even in a jury trial, the findings upon those issues are not binding upon us. In the case at bar, whether the proposed use was a public use would have been for the determination of the judge under the authorities previously cited, and his decision would have been reviewable even if a jury had been impaneled. We should say, however, that we consider the so-called finding which was incorporated in the judgment to constitute in essence merely conclusions of law to the effect that, first, the land was not necessary for public purposes, and second, that the land was not being taken for a public use.

We deem it firmly established that whether a proposed taking is for a public use is a question for the court and not for a jury, even in a jury trial. The decision of the trial court is therefore reviewable. The fact, however, that it is for the court to decide whether a proposed use is public does not mean that we can ignore the plain declaration of the legislature on the subject. The courts must accord respect to the legislative declaration and will presume that a use declared public by the legislature is a public use. *Foeller v. Housing Authority of Portland,* 198 Or 205, 240, 256 P2d 752; *Smith v. Cameron,* and *State v. Hawk,* both supra.

In *Dornan v. Philadelphia Housing Authority,* supra, 331 Pa 209, 200 A 834 at 841, the court said:

"* * * Furthermore, a stronger presumption

arises in favor of the public nature of the use where the taking is by the government itself instead of by a private corporation endowed with the right of eminent domain. * * *"

What is a public use and the circumstances relevant to a determination of that question are well stated in *Rindge Company v. Los Angeles County,* supra, 262 US 700, 67 L Ed 1186 at 1192, 1193, where the court said:

"* * * However, the determination of this question is influenced by local conditions; and this court, while enforcing the 14th Amendment, should keep in view the diversity of such conditions and regard with great respect the judgments of state courts upon what should be deemed public uses in any state. * * *

"* * * It is not essential that the entire community, nor even any considerable portion, should directly enjoy or participate in an improvement in order to constitute a public use. * * * In determining whether the taking of property is necessary for public use not only the present demands of the public, but those which may be fairly anticipated in the future, may be considered. * * *"

In *Bridal Veil Lumbering Co. v. Johnson,* supra, 30 Or 205 at 210, this court, by Justice Robert S. Bean, indicated the relevancy of public benefit on the issue of public use, and said:

"* * * And it can make no difference that its use may be limited by circumstances to a small part of the community. Its character is determined by the right of the public to use it, and not by the extent to which that right is exercised: * * *." Citing cases.

■ From *Gearin v. Marion County,* 110 Or 390 at 401, 223 P 929, we quote:

"* * * 'Public use implies a possession, occupation and enjoyment of the land by the public at

large or by public agencies.' Cooley, Const. Lim. 7 ed.), p 766."

We agree that the term "public use" means a more intimate relationship between the public and an item of property than is denoted by terms such as "public benefit." It demands that the public's use and occupation must be direct and the fact that the public will share in the benefits of private owners is not sufficient. Such was the holding of this court in *Foeller v. Housing Authority of Portland,* supra, 198 Or 205 at 233, 234. That case is of especial importance because the Housing Authority was planning to condemn and clear land in a blighted area and at a later time sell or lease portions thereof to private individuals. The law authorizing such action was held constitutional and the court in upholding the law, said:

"* * * It must be the public which will use and occupy the property upon its acquisition. In the present instance, it is clear that if the attacked statute is sustained as valid it will be a public body, the Housing Authority, and not a private person, which will be authorized to acquire the property in the Vaughn Street Area. Likewise, upon its acquisition and before its resale or lease, if either ever occurs, it will be a public body, the Housing Authority, which will use, possess and occupy the property. No private person will use, possess, have an interest in, or make a profit out of it."

This pronouncement is applicable to the case at bar, although, as we shall show, there are other considerations involved in the pending case which fortify our position. In the pending case there is no claim of right or intention to resell any land. If any land shall in the future be leased it will not be the primary purpose of the project but only incidental or ancillary to the project. The court in Foeller's case pointed out that future

sales by the Housing Authority would place restrictions on the use of land sold and that "The sale is not the primary purpose of the project, but is only incidental or ancillary to it." See, *Dallas v. Hallock,* supra, 44 Or 246 at 256.

In determining whether the proposed use is public we must consider the important holding in *Atwood v. Willacy County Navigation District,* supra. In that case the District brought an action to condemn 1,760 acres for the purpose of constructing a port and attendant facilities. The court said:

> "* * * Under the American authorities, the proper use of the power of eminent domain is exceeded when and only when the municipality condemns land for a use unconnected with its legitimate purposes, and simply in order to meet the costs of its proper objectives. * * *"

The Texas statute pursuant to which the action was brought authorized the District to acquire and operate and "lease." The court referred to the "recoupment theory" under which excess land is taken by condemnation merely to sell it off at a profit and thereby reimburse the state for the purchase price of the land actually needed. The court continued:

> "In our opinion the decision of the Legislature that the acquisition of property under the power of eminent domain by a navigation district 'for or in aid of the development of industries upon said lands' does not constitute a commitment to or adoption of the 'recoupment theory' of eminent domain. The providing of land for industrial sites is not foreign to the legitimate objectives of the district. As above indicated, if a use be in fact public, it is not rendered otherwise by the expressed hope or desire of the Legislature that the district become self-supporting and not remain a drain or charge

upon the general resources of the State. On the other hand, one of the tests of a 'public use' is whether or not the purposes for which the land is acquired are reasonably essential to a successful operation of the municipal district.

"We hold that the acquisition of land for the purpose of leasing the same as industrial sites in the proximity of a port is reasonably necessary to the successful operation of such port. Such use comes well within the definition of 'public use' * * * *."

In so far as it may appear that the District may intend to lease portions of the land to be condemned we should first distinguish between a taking coupled with a proposed disposal by sale or lease of the entire tract, on the one hand, and a possible leasing of a part only of the tract, on the other. A lease of a part may greatly facilitate the operation and principal purpose of the port, whereas a sale or lease of all might destroy the public character of the project. Our inquiry on this phase of the case must begin with Foeller's case supra where we said:

"The fact that the plan which the Housing Authority may draft, and which the city may approve, will possibly provide that the property should be sold to private persons does not in itself demand a holding that the power of eminent domain may not be employed for the acquisition of the property. * * *" *Foeller v. Housing Authority of Portland*, supra, 198 Or 205 at 240.

The portion quoted is supported by citations from our own and other courts followed by an exhaustive review of decisions on condemnation by housing authorities. See also, *Churchill v. Grants Pass*, 70 Or 283, 141 P 164; *Moore v. Sanford*, 151 Mass 285, 24 NE 323; *Ottawa Hunting Association v. State*, 178 Kan 460,

289 P2d 754 at 759; *Dornan v. Philadelphia Housing Authority,* supra.

In *Dyer v. Mayor, Etc., of City of Baltimore,* 140 F 880, pursuant to the "Burnt District Act", the District undertook to condemn land in a burned area for wharves and docks. By a suit for injunction the landowners sought to restrain the condemnation on the ground that the city was planning to lease the public wharves to private interests. Plaintiff introduced in evidence an advertisement signed by the city comptroller inviting applications from persons desiring exclusive rights in the proposed new docks and piers. The decision of the federal court was two-fold. First, it held that the city could only act by ordinance, and so far as appears, the invitation for bids was without lawful authority and "commits the city to nothing." As a second ground, the court said:

"* * * It is no doubt probable that the requirements for strictly public wharves may not exhaust all the piers and docks which it will be necessary to construct in carrying out the beneficial changes contemplated by the plan of the burnt district commission, and that there may be space which the city can only utilize by leasing it; but it would not follow that the improvement as a whole was not for a public use which it was the duty of the city as a municipality to see carried out. Regard must be had to the methods by which the public wharves of a city are availed of in modern commerce. Public landings on a river bank open to every vessel that chooses to make fast to it are not suitable to every kind of modern transportation by water. In a case in which by an act of the Legislature of New York there was granted to the city of New York the power to condemn property in order to erect a great number of piers according to a general plan for improving its water front, and the act gave power to the city to lease certain

of the piers for special uses, it was held that the act was a valid exercise of the right of eminent domain. In City of New York v. N. Y. Central & Hudson River R. R., 135 N. Y. 253, 31 N. E. 1043, 31 Am. St. Rep. 825, Mr. Justice Peckham, speaking for the Court of Appeals of New York, holds that:

" 'Land which is thus taken is taken for a public use, although some portion of all the land actually used may thereafter, in the discretion of the city, be divided off and placed in the exclusive possession of a lessee for the sole purpose of using it in the transaction of the necessary business connected with the loading and unloading of passengers and cargoes of ships and steamers.' " 140 F 880 at 886.

The court refused to enjoin the condemnation proceedings. To the same effect see, *In re Mayor of City of New York,* 135 NY 253, 31 NE 1043; *North Carolina State Ports Authority v. First-Citizens Bank & Trust Co.,* 242 NC 416, 88 SE2d 109 (1955); 29 CJS 842, Eminent Domain, § 51.

From American Jurisprudence we quote:

"* * * It has been held more than once that land taken by a city for docks, piers, and wharves is taken for public use, although some portion of it is thereafter, in the discretion of the municipal authorities, set apart and put in the exclusive possession of a steamship line for the sole purpose of loading and discharging cargoes of freight and passengers. The public nature of docks, piers, and wharves, belonging to a municipality, is not taken away by leasing them separately to different parties exclusively for commerce, pursuant to a general plan that aims to accommodate all comers. * * *" 18 Am Jur 698, Eminent Domain, § 68.

And see, *Moore v. Sanford,* supra, 151 Mass 285, 24 NE 323.

Speaking of the exercise of eminent domain for acquisition of wharves and docks, we read:

"* * * When statutes authorizing the exercise of eminent domain for such a purpose have been enacted in this country, it has been uniformly held that the furtherance of the commercial interests of the port, and the facilitation of the transportation of goods and the travel of passengers to and from all parts of the world furnished ample justification for the enactment and that a taking for such a purpose was for the public use, although it was part of the plan that the wharves and piers should be leased separately to private parties and left in the exclusive possession of the lessees, since all persons desirous of leasing wharves were to be accommodated without discrimination, and the wharves were to remain subject to public control. * * *" 2 Nichols on Eminent Domain, Third Edition, § 7.5132, page 502.

See, 20 CJ 579, Eminent Domain, § 61; 29 CJS 842, Eminent Domain, § 51; *Marchant v. Mayor et al. of Baltimore,* 146 Md 513, 126 A 884.

Defendants cite three cases which appear to be contra to the great weight of authority. The cases are, however, distinguishable. *In re Opinion of the Justices,* 204 Mass 607, 91 NE 405, the question for decision was whether the legislature could authorize the city of Boston to condemn for wide thoroughfares "and to take not only the land or easements necessary for the same but also such quantities of land on either side * * * as may be reasonably necessary * * * with a view to subsequent use by private individuals." The court answered the question in the negative but clearly distinguished the case from *Moore v. Sanford,* decided by the same court and which has been cited supra.

In "Opinion to the Governor", 76 RI 365, 70 A2d 817, the Rhode Island court held that the construction

of a "marina" was a public use, but said that the provision of the statute authorizing the Development Authority to lease the entire project was unconstitutional.

The third case cited by defendants is *Cincinnati v. Vester*, 33 F2d 242. That case merely held that excess condemnation by a city in the widening of a street for the purpose of selling the excess at a profit was not a condemnation for a public use. None of these cases resembles the one at bar.

■ We hold that the statute authorizing the condemnation of land by a port district for the purposes enumerated in the statute is constitutional and that the proposed taking is for a public use.

■ The defendants next plead that even if the proposed use is public, there is no necessity for the acquisition of so large a tract of land and that the Commission abused its discretion in that respect. But the Commission is not limited to a taking which will satisfy the immediate and present needs of the Port. In determining the amount of land to be taken the Commission was entitled to consider probable future needs as well as those of the present. "The proper limitation is the orbit of reasonable anticipation of future needs." *State v. Superior Court for Snohomish County*, 34 Wash2d 214, 208 P2d 866. And see, *Rindge Co. v. Los Angeles County*, supra, 262 US 700, 67 L Ed 1186; 2 Lewis, Eminent Domain, Third Ed, § 601, p 1162.

> "A condemning corporation may condemn lands sufficient to provide for not only its present but also its prospective necessities, if it is not more than may in good faith be presumed necessary for future use within a reasonable time. * * *." 29 CJS 890, Eminent Domain, § 92.

In addition to its right to consider future needs, there are other rules which bear upon the powers of

the Commission and which guide its conduct. The phraseology of the statute is persuasive indication that wide discretion is vested in the Port authorities. They are authorized to condemn any property "which is found necessary or convenient", etc. ORS 777.115. The immense scope of the authorized activity of a port under the provisions of ORS 777.130 argues that land found to be necessary or convenient may be commensurate with the scope of the proposed activity within the statutory authority.

We have taken notice of rules which are primarily of concern to the Port Authorities in their activities. We now point out that the primary responsibility is that of the Commission and not of the court. It is firmly established law that the wisdom, expediency or necessity for taking is a legislative question and not one for the courts.

> "The overwhelming weight of authority makes clear beyond any possibility of doubt that the question of the necessity or expediency of a taking in eminent domain lies within the discretion of the legislature and is not a proper subject of judicial review. There are various aspects of this principle which have crystallized into specific questions. In accordance with the general principle, it has been held that the courts may not inquire into the question.
>
> \* \* \* \* \*
>
> "(4) Whether there is a need for the property to the extent sought to be required." 1 Nichols on Eminent Domain 373, § 4.11.

See, *State v. Hawk*; *Bridal Veil Lumbering Co. v. Johnson*; *Coos Bay Logging Co. v. Barclay*; *Apex Transfer Co. v. Garbade*; *Sears v. City of Akron*; all supra; and, *City of Waukegan v. Stanczak,* 6 Ill2d 594, 129 NE2d 751.

 There remains only the question whether the Commission was guilty of fraud, bad faith or abuse of discretion. The Oregon rule is well stated in *City of Eugene v. Johnson,* supra, as follows:

> "* * * But the necessity, propriety, or expediency of appropriating property for public use, the amount and location of the property to be taken, and its suitableness for the proposed use are all political or legislative questions. And the determination of those matters by a grantee of the power of eminent domain is, in the absence of fraud, bad faith or abuse of discretion, final and not subject to review by the courts. * * *" 183 Or 421 at 426.

There is no charge of fraud or bad faith. Whether there was an abuse of discretion is a question of law for the court. *Atwood v. Willacy County Navigation District,* supra, Tex Civ App, 271 SW2d 137.

 We are not bound by the declaration of the trial court to the effect that the taking is "far in excess of the needs", for, as said in *City of Eugene v. Johnson,* supra:

> "The necessity for the taking of property is a question of law for the court and not one of fact to be decided by the jury, and, if it is made an issue, it should be settled by the court before the jury is impaneled." Citing cases. 183 Or 421 at 428.

To the same effect see, *Highway Commission v. Pacific Shore Land Co.,* 201 Or 142, 269 P2d 512; *Wilton v. St. Johns County,* 98 Fla 26, 123 So 527.

We have previously observed that in the judgment of the circuit court the only findings were that 168 acres is "far in excess" of the needs of the Port and that a large portion is taken for private purposes. In

the judgment there is no finding of abuse of discretion, although the memorandum opinion does express the opinion that the "Port District has abused its discretion in seeking to acquire the entire area \* \* \*." In that opinion we find no reference to the cases cited supra in which it is held that ports may lease portions of their land to industry as an incident of its service to the public, and no discussion of the well established rules which give to the Commission a very wide discretion and which in fact state that the extent of the taking is a legislative and not a judicial question. In its opinion the trial court took note of the fact that the Port Engineer's plan for full development envisioned a taking of 1,000 acres and "provides for areas for playgrounds, wholesale and distribution area and an industrial area." No mention was made of the fact that the Commission has never adopted the engineer's overall plan or that the recreation area (called a playground) incidental to the small-boat facility, the housing area and wholesale and distribution areas are none of them located by the engineer on the 168 acres involved in this proceeding. We hold that the court erred in finding that the 168 acres was not taken for public use. We fear that the decision concerning abuse of discretion was based upon the judgment of the trial court that the proposed use was private, with which we cannot agree, and upon his independent appraisal as to the immediate needs of the District, without giving sufficient weight to legislative determination by the Port Authority.

Defendants cite and rely upon three cases as defining abuse of discretion: In *Casciato v. Oregon Liquor Control Commission,* 181 Or 707, 185 P2d 246, the court quoted with apparent approval several definitions of that phrase, without expressly adopting any

one of them. From Bouvier's Law Dictionary, the following was taken:

> " 'Abuse of discretion. A discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.' " 181 Or 707 at 715.

From 18 Corpus Juris, page 1136, came the following:

> " '* * * However incapable of exact definition, it is clearly recognized that discretion is not absolutely without elements, conditions, or limitations. The term implies the absence of a hard and fast rule, yet it should not be another word for 'arbitrary will,' 'inconsiderate action,' or 'unstable caprice.' " Ibid.

A California case (*Sharon v. Sharon, Exr.*, 75 Cal 1, 16 P 345) was quoted, as follows:

> " 'Abuse of discretion' * * * does not necessarily imply a wilful abuse, or intentional wrong. In a legal sense, discretion is abused wherever, in its exercise, a court exceeds the bounds of reason— all the circumstances before it being considered." 181 Or 707 at 715.

From a Wisconsin court (*Murray v. Buell*, 74 Wis 14, 41 NW 1010) came this:

> " '* * * It is really a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.' " 181 Or at 716.

From an Ohio court (*State v. Ferranto*, 112 Ohio St 667, 148 NE 362) came a definition of extreme breadth:

> " 'Where a court does not exercise a discretion in the sense of being discreet, circumspect, prudent, and exercising cautious judgment, it is an abuse of discretion.' Words and Phrases." 181 Or 707 at 716.

Other cases were cited as supporting the proposition that no abuse of discretion can appear unless the dis-

cretion was exercised "on grounds, or for reasons, clearly untenable, or to an extent clearly unreasonable, * * *."

Defendants rely upon *Payne v. Cohen,* 168 SC 459, 167 SE 665. In that case the court said:

"* * * the phrase 'abuse of discretion' does not carry with it an implication of conduct deserving censure, but means simply that the trial judge committed error of law—in the exercise of his discretion."

This definition is to us incomprehensible. If a trial court committed error of law, no question of discretion is involved. A more accurate approach is made in *State v. Draper,* 83 Utah 115, 27 P2d 39, 50, where it is said"

"By an 'abuse of discretion,' * * * 'is meant a clearly erroneous conclusion and judgment—one that is clearly against the logic and effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing.' "

Our own decisions declare that the courts will not set aside the action of the condemning authority in the absence of a "very clear abuse of discretion." *Dallas v. Hallock,* supra, 44 Or 246, 254, 75 P 204.

In *Harland v. Chandler,* 208 Or 167, 300 P2d 412, the plaintiff property owner sought to enjoin the taking of land for a highway by the State Highway Commission. Plaintiff alleged that the plaintiff acted arbitrarily, capriciously, in bad faith, and with a bad motive and purpose and abused its discretion in the adoption of the resolution, and added that the proposed

improvement was not economically sound or practical. The court said:

> "* * * While we do not attribute infallibility either to the members of the Commission or the employees of the department, we are of the opinion that something more than a general broadside such as we have quoted should be required in a pleading before the Commission may be brought into court to answer to a charge of bad faith and abuse of discretion. Otherwise, it might well be that the Commission would be forced to spend its time defending law suits instead of building and maintaining highways."

The court added:

> "* * * the plaintiff would have us substitute our judgment for that of the Commission and its engineer. This we must decline to do. * * *"

We think the general discussion by Nichols defines the power of the courts to interfere with the legislative discretion as adequately and more accurately than the decisions cited by the defendants. After Section 4.11 quoted supra, we find Section 4.11[2] which states the limitations on legislative power in condemnation cases. It reads as follows:

> "There is, however, at least a theoretical limit beyond which the legislature cannot go. The expediency of constructing a particular public improvement and the extent of the public necessity therefor are clearly not judicial questions; but it is obvious that, if property is taken in ostensible behalf of a public improvement which it can never by any possibility serve, it is being taken for a use that is not public, and the owner's constitutional rights call for protection by the courts. So, also, the due process clause protects the individual from spoliation under the guise of legislative enactment, and while it gives the courts no authority to review

the acts of the legislature and decide upon the necessity of particular takings, it would protect an individual who was deprived of his property under the pretense of eminent domain in ostensible behalf of a public enterprise for which it could not be used. While many courts have used sweeping expressions in the decisions in which they have disclaimed the power of supervising the selection of the site of public improvements, it may be safely said that the courts of the various states would feel bound to interfere to prevent an abuse of the discretion delegated to the legislature by an attempted appropriation of land in utter disregard of the possible necessity of its use, or when the alleged purpose was a cloak to some sinister scheme. In other words, the court would interpose in a case in which it did not merely disagree with the judgment of the legislature, but felt that that body had acted with total lack of judgment or in bad faith. In every case, therefore, it is a judicial question whether the taking is of such a nature that it is or may be founded on a public necessity. But while the courts have frequently declared their power to set aside acts of the legislature upon such a ground, cases in which the power has been actually exercised seem rarely to have arisen." 1 Nichols on Eminent Domain, § 4.11[2].

■ Since we have concluded that the only question meriting further consideration is whether there was an abuse of discretion, we have followed the unusual practice of reserving discussion of the evidence to the end. In our opinion the evidence fails to show any abuse of discretion but on the contrary it demonstrates a businesslike and far-sighted approach to a question of great public importance. As stated by the trial court, "The evidence was to a large extent undisputed * * *." The area in issue is almost wholly undeveloped, consisting of sand, largely covered with sage-

brush, but its utility as a natural port site is unquestioned.

After the organization of the Port in 1940, and with the construction of the Bonneville and McNary Dams, it became feasible to construct a port within the District to facilitate navigation. With the completion of the John Day Dam it was reasonably anticipated that large barges would be able to navigate the Columbia River from above the Cold Springs Site to the sea. That site is located on the Columbia River and on the so-called McNary Lake, about 15 miles east of the city of Umatilla. It is at a strategic point on quiet water where the major highway, the major railroad and the river converge. We need not review the evidence concerning the suitability of the Cold Springs Site for port development, for counsel for defendants in their brief state that it is generally known as one of the finest port sites on the Columbia River. The 168 acres which the plaintiff seeks to condemn was a part of 726 acres which was purchased by the defendants in October of 1944. It was purchased by them "for the purpose of developing this area as a port." Defendants have gone to heavy engineering expense in planning a port site on their land, and "are very anxious that a port be developed."

Negotiations between the plaintiff District and the defendants were commenced in 1954, the year in which the first report of consulting engineers was prepared at the instance of the plaintiff. Defendants offered to donate to the plaintiff approximately 39 acres of their land bordering on the river, but the offer was refused, and in May 1956 the plaintiff commenced this action to condemn 168 acres.

As stated by the defendants, the land which plaintiff seeks to condemn comprises (1) a general cargo

port facility, (2) grain elevator and processing area, (3) petroleum products area, (4) bulk commodity area, and (5) industrial or processing area. Counsel for defendants state that "The general scheme then goes outside of the area involved in this proceeding and provides for a general industrial area, a small boat marina, a potential lagoon for industrial waste, a wholesale and distribution area, a small business and retail housing area." We need not determine whether the uses proposed for lands of others than the defendants would be public uses or would be necessary or convenient in connection with the Port project. The defendants are concerned only with the use of and necessity for their lands. The evidence concerning some proposed small-boat facility, recreation area, and small business and retail housing area is irrelevant for the reason indicated.

Witnesses were examined at length concerning the land required for phases "A", "B", "C", "D", "E", and "F", as outlined in the December 1955 report of the engineers. Counsel for defendants objected to the reports as irrelevant and immaterial, there being no showing in the complaint that the Commission had taken any action on the engineer's reports. Several reports of the engineer were submitted to the Commissioners of the Port, and clearly show the program which the Port had under consideration, but they do not bind the Port to carry out the engineer's program except as the Port may have adopted the reports or shall hereafter do so. We have found no official action by the Port Commission adopting the broad and comprehensive plan outlined by the engineer. That plan calls for development of the Port in six phases and involving a total of about 1,000 acres, whereas the resolution of the Port calls for condemnation of 168

acres only. At one time at least the defendants were of the opinion that the issue was limited to a consideration of the proposed uses which are specified in the resolution set forth supra. When counsel for plaintiff asked "What purposes, Mr. Bounds, does the Port intend to use this area for, if acquired?", counsel for defendants objected, as follows:

> "Mr. Kilkenny: We object to that, Your Honor, this action, itself, tells what purpose the land can be used for; we know what the lands are going to be used for; their resolution, itself, says, what the land is going to be used for."

This position is incompatible with the present contention that the Port intends to lease land to others, a purpose not mentioned in the resolution. The witness who was Commissioner and Secretary of the Port was permitted to answer, as follows:

> "The port plan now is for the development of port facilities; of course, the first requirement would be an area for a dock and boat landings; we would need an area for warehousing, roads, railroad spur, and the usual facilities that are necessary to the development of a complete port area."

He did not set forth any official action defining the purposes, and we have found no evidence of such official action except in the resolution. Others, especially the consulting engineer, outlined the comprehensive plan, but witness Bounds confirmed that "the report is a planned report by the engineers; it is not binding upon the commission." In our opinion the report and testimony of the engineer and other witnesses was admissible to show the good faith investigation made by the Port, and the suitability of the area and its possible uses, but such testimony did not bind the Port to the uses indicated in the report as desirable or

practicable, nor is the Port bound by expressions of intention or hope by the individual commissioners.

When the engineer, Mr. Haner, was under examination, he was asked concerning proposed housing, small business, retail, and small-boat areas which were indicated on certain exhibits, and he stated that they were not located upon the land of the defendants which the plaintiff seeks to acquire. The so-called recreation area is also located upon other lands. The witness admitted that these various uses were included in his over-all plan but did not intimate that the Port had approved such over-all plan.

We deem it unnecessary in this opinion to recite the evidence introduced by the Port. It is sufficient to say that in addition to the testimony of consulting engineer Haner, the Port introduced evidence by Roger J. Bounds, banker and Port Commissioner, Irwin Mann, Jr., cattle man operator of a feed lot and President of the Port Commission, Paul B. Follett, sales and traffic manager of Tidewater-Shaver Barge Lines, and former Port Commissioner, Elmer Kerns, President of Pilot Rock Lumber Company and former Port Commissioner, Jens Terjeson, wheat grower, former chairman of the Oregon State Wheat Commission and former President of the National Association of Wheat Growers and presently Port Commissioner, Dolph D. Kimsey, long-time manager of the Port of The Dalles, William O. McCormmach, rancher and Port Commissioner, and Henry W. Davies, former manager and engineer of the Port of Port Angeles for 26 years.

These were substantial and credible witnesses and they made an impressive presentation of facts showing the growth of the area tributary to the Port, its probable future increase, the demand for port facilities at the proposed site and the space requirements at

least as large as 168 acres. They showed that the Port planned to construct a grain elevator of one million-bushel capacity; that shipyard and repair facilities, parking space and shipping facilities were needed. They showed the desirability of acquiring sufficient land to prevent undesirable, uncontrolled and inefficient development of areas immediately adjacent to the port facilities.

Running throughout the testimony we find that the commissioners as individuals contemplate the possibility, perhaps the probability, of constructing and then leasing facilities to industrial concerns whose operations would be of immense importance to the successful operation of the Port. The highly-qualified witness Follett testified that his concern could probably occupy 50 acres and 2,000 feet of waterfront and that its competitor would use a like amount. Thus the right to lease for such purposes was discussed in the testimony, but no official action binding upon the Port has been shown to the effect that the specific land to be acquired from the defendants would be leased to industry. In this connection the position of the defendants is somewhat anomalous in that they emphasize the possibility of leasing to industry as evidencing the nonnecessity of the taking and hence the abuse of discretion, but also object to evidence offered concerning the purposes to which the Port proposed to use the land, because the "resolution itself says what the land is going to be used for," and at a later point they again object "as previously * * * the only factors that can be considered are set forth in the statute."

In view of the evidence received and which we have examined, it is not our purpose to base our decision of this case upon a finding that exactly 168 acres are necessary. That determination is not for the judiciary

to make. But we do say that the evidence is highly relevant and persuasive to the effect that the Commission in resolving that such acreage was necessary did not abuse its discretion.

The judgment of the circuit court is reversed and the cause is remanded for determination of the just compensation to which the defendants will be entitled. The decisions of this court constitute a guaranty that the defendants will receive the fair market value of the land to be taken.