Edward KNIGHT, Appellant
(Petitioner),

v.

ENVIRONMENTAL QUALITY COUN-
CIL OF the STATE OF WYOMING,
Aspens Water and Sewer District (As-
pens I) and Teton Pines Water and
Sewer District (Aspens II), Appellees
(Respondents).

No. 90–154.

Supreme Court of Wyoming.

Jan. 23, 1991.

James K. Lubing of Goody and Lubing, Jackson, for appellant.

Terri A. Lorenzon, Sp. Asst. Atty. Gen., for appellee Environmental Quality Council; Blair J. Trautwein of Hathaway, Speight, Kunz, Trautwein and Barrett, Cheyenne and Larry L. Jorgenson, Jackson, for appellees Aspens Water and Sewer Dist. and Teton Pines Water and Sewer Dist.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

URBIGKIT, Chief Justice.

An adjacent neighbor's objection to the Wyoming Department of Environmental Quality's approval of a planned sewer disposal system for a community association creates this appeal. The neighbor, present appellant, was a protestant in the administrative hearings and then petitioner on appeal to the district court. Appellant now appeals to this court from the state agency approval of a deep well injection for the system effluent. We affirm the administrative agency action in approval of the construction and operation of the proposed system.

The Environmental Quality Council (EQC) approved plans for two separate sewer districts, Aspens Water and Sewer

District and Teton Pines Water and Sewer District (Sewer Districts). The Sewer Districts joined together to establish a general sewer treatment system to serve approximately 400 households and 1,500 people in the suburban "rural" Teton County, Wyoming area in the vicinity of Jackson, Wyoming. Present appellant, Edward Knight (Knight), participated in the initial administrative hearings and objected to the application before approval by the EQC on September 4, 1989. Knight raised objection for only the method used for clear liquid disposition. Knight then appealed to the district court for its review of the approval of the deep well process. The district court affirmed the EQC decision with a comprehensive and detailed judgment and order on May 9, 1990. We also affirm for the same reasons stated by the district court in its appellate review.

Knight frames his issues as:

I. Whether the Supreme Court is required to give any deference to the decision of the District Court as to questions of law or fact.

II. Whether the failure of the EQC [Environmental Quality Council] to consider alternatives under the belief that they were restricted to "on-site" disposal constitutes reversible error due to an erroneous interpretation of the authority of the County Commissioners to so restrict the EQC and the DEQ [Department of Environmental Quality].

III. Whether the granting of the injection well permit violates the express terms of the Water Quality Rules and Regulations of the Environmental Quality Act.

The Sewer Districts respond as follows:

I. The EQC acted properly in approving the District's UIC permit application. Their decision was not arbitrary, capricious or an abuse of discretion and was supported by substantial evidence.

A. The doctrine of pre-emption is not applicable to this case.

B. EQC's decision was to either approve or disapprove underground injection. It did not have the authority within the context of a contested case hearing on an application for a UIC permit to direct other methods of discharge.

C. EQC can properly take into account the position of the county commissioners as an institutional factor.

D. Aspens/Pines demonstrated consideration of alternatives to the Environmental Quality Council, including discharge directly into the Snake River and transporting the effluent to the Town of Jackson via pipeline. The best management alternative is underground injection.

E. Petitioner's contention that the EQC determined the County Commissioners pre-empted EQC authority to consider off-site alternatives based on assumptions with no record support.

II. The treated effluent (Class I Domestic Water) that will be injected into the ground water is not waste and is not pollution.

The EQC otherwise defines the issues as:

I. Whether the Supreme Court is required to give any deference to the decision of the District Court as to questions of law or fact.

II. Did the EQC erroneously interpret the law applicable to issuance of UIC Permit # 89–014.

a. The record does not support Petitioner's contention that the EQC determined the County Commissioners preempted the EQC's authority.

b. The Law applicable in this case is contained in the Wyoming Water Quality Standards and Regulations.

c. The County Commissioners' endorsement was an institutional factor to be considered.

III. Does the granting of the injection well permit, violate[ ] the express terms of the Water Quality Rules and Regulations of the Environmental Quality Act.

a. The treated effluent that will be injected is not waste and is not pollution,

b. Issuance of the permit is consistent with protection of water quality under Wyoming law and federal law.

c. Statutory Construction.

Actually, the issues comprehensively addressed and assiduously advanced on appeal are:

1. Contended acceptance by the state agency of a county commissioner veto—the local government preemption and veto issue.

2. Legal and factual sufficiency of the application and proof to justify agency decision authority for a deep well injection from the sewer plant instead of the other alternative dispositions which included aeration and evaporation, transfer approximately nine miles to the Jackson sewer plant or direct open pipe flow into the Snake River which flows through the area into Idaho—the sufficiency of the evidence issue.

Teton County is no longer rural where adequate acreage of fee land is available for development. Suburbanization activities first resulted in individual well and septic systems for the acreage properties which then led to the organization of two sewer districts and their activities to develop community sewer disposal systems or, in some cases, to also develop water systems. The total system involves approximately 400 homes and 1,500 inhabitants in a rather confined area. The plans for the trunk line system and central plant created no serious controversy about the construction of the system until an issue was raised about what would be done with the purified water which flowed out of the plant after completed treatment and solid material removal.

Like most developmental activities in that community, each available option was approved by someone and highly contested by others dependent on the particular effect. The town showed no special interest in having the additional volumes of water flow into its plant and it mattered little since the outflow would reach the same river system. A number of miles of piping and consequent right-of-way denigration of the area would be required.

The second choice was to dispose of the purified water by open pipe outflow into the Snake River, which was upstream from Jackson and an area of heavy activity in fishing and white water rafting. A large contingent of people who would object were probably responsible for the defined and strongly stated views of the Teton Board of County Commissioners. A third choice was a deep well injection system for disposal into the glacially created alluvial subsurface strata. The fourth choice was the creation of large aeration and evaporation ponds, but no particular support developed considering the land usage required for the open ponds or olfactory results which might follow.

Knight, down flow from the community system and its septic plant, argued diligently for anything but deep well system disposition since he used a well to supply potable household water. As an alternative, he suggested the system be designed to send the residual product back up to the highest elevations of the community system ownership in order to flow underground under their land before reaching where these neighbors would be living. A general flow rate of approximately fifteen feet a day was indicated in some of the technical data. This recommendation involved piping the water uphill to run underground through the subdivision. Lacking reasoned support for that uneconomic idea, anything, except deep well disposition, was found to be preferable to him.

The record leaves no doubt about the Teton Board of County Commissioners' objection to the open pipe river flow into a scenic river where boaters and fishermen would pass. Knight argues that the EQC permitted this advice and attitude of county officials to act as a veto and then preempt the ultimate decision. Additionally, Knight contends that the disposal well would violate express terms of the Environmental Quality Act by allowing injection of the treated product into the usable aquifer and, "[t]herefore, the orders of the EQC and of the District Court are invalid and must be reversed, * * *."

Defined physical facts structure our review of the EQC decision. Within that mountain confined alluvial valley of limited acres of private land and growing popula-

tion, there were only the four basic ways to dispose of the treated and purified water that would flood from the $3.5 million plant. First, everyone agreed that the plant was appropriate and necessary for maintenance of the health of the inhabitants of the area. Since what then went into the plant would inevitably come out in some form, there were only the four opportunities for purified water disposition:

1. Up into the air by aeration and evaporation by settling ponds; or

2. Down into the subsurface aquifers to flow underground which would ultimately reach the river; or

3. Pipe across the valley into the Town of Jackson where it could be run through its plant and then to flow back into the river valley system downstream; or

4. Pipe out of the area to the Snake River for in-stream flow.

Alternatively, a fifth opportunity would be to do nothing and not use the sewer plant. This was one solution that no one assumed to be appropriate.[1]

This inquiry of up, down or across faced all the professional planners and designers who became involved in the planning for the federally financed local community sewer waste disposal system.

■ We have read the record with care and do not find the contended legal error of the EQC in factually permitting the county commissioners to make the decision. Their view was considered, but not deemed pre-

clusive by the membership of the EQC. In first decision, we find nothing reflecting that the EQC yielded unduly to the political pressures applied by the county commissioners which would constitute making an arbitrary and unfounded decision. A significant view was considered in taking into account what is in the nature of governmental regulatory agencies.

■ The second argument asserts, as a matter of law, that the clean water effluent, even if qualified to be Class I Domestic Use Water and consequently potable, was still a polluted effluent and under no circumstances could be injected into the subsurface strata where it would become part of the potable water supply for downstream users.

A telling argument was made by the EQC and the Sewer Districts in response that all septic systems, unless evaporative which would go into the air, ultimately flow the effluent into the downstream water system so that only those persons resident at the top of the mountains are not reusing water which has been previously used and, by the time the water reaches the ocean, used many times. The question was not reuse, but proper clean-up and treatment.[2]

■ Addressing that second argument, there is nothing factually presented which demonstrates arbitrary or capricious administrative agency action. We do understand the argument that the sewer treating plant outflow is water that has been previously "used" and then treated. We, how-

1. Dean R.R. Hamilton, in an earlier era at the University of Wyoming Law School who taught contracts among other subjects, defined this factual situation as, "it all depends on whose ox is being gored."

2. The stridency of the objection by Knight is not clarified by justification in view of the provision of the order which assured him both sewer system disposition and system water connection. The Findings of Fact, Conclusions of Law and Order of the EQC included:

19. In order to facilitate waste treatment in the area of the Aspens and the Teton Pines development, the Applicants proposed that the Aspens/Teton Pines wastewater treatment and water supply systems be supplemented to provide for an eight inch water line from the main Aspens/Teton Pines water distribution line to the boundary of the property described as the Hardeman 80 acres, and to provide for an eight inch line for wastewater from the Aspens/Teton Pines wastewater treatment plant to the property boundary of the Hardeman 80 acres. These lines will also service the Ed Knight property. A map showing this property is attached as Appendix C to this order, which map is incorporated herein by reference. The Applicants will provide up to twenty-eight free hook-ups for the Hardeman property and one free hook-up for Mr. Knight, with the limitation that such users will have to provide their own distribution and collection systems, and will have to pay their reasonable share of operating and maintenance costs for the applicable Aspens/Teton Pines plant facility.

ever, can accept the technical conclusion of the EQC that if it is Class I water and appropriate for use, it is not a "pollutant" when injected into subsurface strata. The water has to go somewhere and, clearly, Knight would not want aeration and evaporation ponds large enough to handle that volume in close proximity to his residence. We cannot say that, as a matter of law, the EQC abused its discretion or that rejection of the direct flow into the river was sufficiently inappropriate so as to render the decision arbitrary and capricious.

What is strange about all of this is that inevitably the plant system was absolutely necessary for the health of the entire area and its $3.5 million construction benefited every rural residence by improving the water which is used for households where wells continue to be the source, whether downstream from the residents or at higher elevation. Creation of the sewer districts and construction of the modern plant providing for effective treatment of the residential sewer added immeasurably to the environment for the health. In fact, the injection did not change the disposition—it only assured cleanliness and safety.

 The district court, in a comprehensively stated and completely researched decision, analyzed and determined:

1. In his brief, Petitioner raised three issues: I) Whether the EQC failed to consider alternatives under the belief that they were restricted to "on-site" disposal constitutes reversible error due to an erroneous interpretation of the authority of the County Commissioners to so restrict the EQC and the DEQ; II) whether the granting of the injection well permit, violates the express terms of the Water Quality Rules and Regulations of the Environmental Quality Act; and III) whether the Order of the EQC following the May 17, 1989 hearing is void due to the failure of the agency to give full thirty-days notice of the hearing to Petitioner and the general public. It should be noted that Petitioner abandoned issue number III at the time of the oral argument.

2. Petitioner also alleges in his Petition for Review: (1) The decision of the EQC was arbitrary and capricious, an abuse of discretion, and not in accordance with law; (2) the decision is violative of Petitioner's right to due process of law; (3) the procedures utilized in the subject hearing and decision are not in accordance with law; and (4) the decision is not supported by substantial evidence.

3. The burden of proving arbitrary, illegal or fraudulent administrative action is on the complainant, and this burden includes not only the clear presentation of the question, but also placement of evidence in the record to sustain the complainant's position. *Wyoming Bancorporation v. Bonham,* 527 P.2d 432 (Wyo.1974). The Court's power to review agency actions to determine if they are arbitrary, capricious or characterized by an abuse of discretion calls for an examination of whether the agency's decision is based on a consideration of relevant factors and whether it is rational. *Tri-State Generation & Transmission Ass'n v. Envtl. Quality Council,* 590 P.2d 1324 (Wyo.1979).

4. A District Court reviewing an agency action will not substitute its judgment for that of the board or commission. *Shenefield v. Sheridan County School Dist. No. 1,* 544 P.2d 870 (Wyo. 1976).

5. The District Court sits as an intermediate appellate court with power only to review actions taken by administrative tribunals, and it is not within the prerogatives of this Court to substitute its judgment for administrative authority, or to perform duties assigned by law to administrative boards, committees and officers. *McGuire v. McGuire,* 608 P.2d 1278 (Wyo.1980).

6. This Court cannot substitute its opinion as to the weight and credibility of evidence for that of the EQC. *Gilmore v. Oil & Gas Conservation Comm'n,* 642 P.2d 773 (Wyo.1982).

7. The ultimate weight to be given evidence before the EQC as a trier of fact is to be determined by that agency

in light of the expertise and experience of its members in such matters. *Telstar Communications, Inc. v. Rule Radiophone Serv., Inc.,* 621 P.2d 241 (Wyo. 1980).

8. Administrative appeals of this nature are confined to the administrative record. *Tri–County Elec. Ass'n v. City of Gillette,* 525 P.2d 3 (Wyo.1974).

9. An administrative decision is to be reversed only for errors of law, including the lack of substantial evidence to support it. *Shenefield v. Sheridan County School Dist. No. 1,* 544 P.2d 870 (Wyo. 1976).

10. Courts may set aside an action of an administrative agency only where its action is arbitrary or fraudulent or where there is an illegal exercise of discretion. *Wyoming Bancorporation v. Bonham,* 527 P.2d 432 (Wyo.1974).

11. The terms "abuse of discretion," "arbitrary," and "capricious" are frequently used interchangeably. Arbitrary and capricious actions are ways to abuse discretion. Judicial discretion is "a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Martin v. State,* 720 P.2d 894 (Wyo.1986); *Intervenor Vandehei Developers v. Public Service Comm'n,* [790] P.2d [1282] (Wyo.1990).

12. Abuse of discretion has been explained as follows: "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances." *Utah Power & Light Co. v. Public Service Comm'n of Wyoming,* 713 P.2d 240 (Wyo.1986); *Intervenor Vandehei Developers v. Public Service Comm'n,* [790] P.2d [1282] (Wyo.1990).

13. The Wyoming Administrative Procedure Act provides that it is the duty of the Court reviewing an agency action to determine if the decision was supported by substantial evidence. *§ 16–3–114 W.S.1977, as amended.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it may be less than the weight of the evidence but cannot be contrary to the overwhelming weight of the evidence." *Wyoming Insurance Dept. v. Avemco Insurance Co.,* 726 P.2d 507 (Wyo.1986); *Intervenor Vandehei Developers v. Public Service Comm'n,* [790] P.2d [1282] (Wyo.1990).

14. Substantial evidence is such relevant evidence as reasonable minds would accept as adequate to support a conclusion. *Southwest Wyoming Rehabilitation Center v. Employment Security Comm'n of Wyoming,* 781 P.2d 918 (Wyo.1989); *Intervenor Vandehei Developers v. Public Service Comm'n,* [790] P.2d [1282] (Wyo.1990). In determining whether that quantum of evidence is present, all of the evidence on the record, both that which supports and that which conflicts with the agency's decision must be reviewed, and the Court must determine whether the agency could reasonably conclude what it did. The standard requires more than a mere scintilla of evidence, more than a mere suspicion that a certain fact exists. However, once that measure of evidence has been found to exist, the possibility of drawing two inconsistent conclusions from a body of evidence does not prevent a finding that the conclusion drawn by the administrative agency was supported by substantial evidence. *Burlington Northern Railroad Co. v. Public Service Comm'n of Wyoming,* 698 P.2d 1135 (Wyo.1985); *Intervenor Vandehei Developers v. Public Service Comm'n,* [790] P.2d [1282] (Wyo. 1990).

15. The Courts will defer to the experience and expertise of the agency in its weighing of the evidence and will disturb its decisions only where it is clearly contrary to the overwhelming weight of the evidence on the record. *Cody Gas Co. v.*

*Public Service Comm'n of Wyoming,* 748 P.2d 1144 (Wyo.1988).

THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

1. This Court has jurisdiction to hear this appeal by virtue of Rule 12.03 W.R. A.P.

2. Aspens Water and Sewer District ("Aspens I") and Teton Pines Water and Sewer District ("Aspens II"), Respondents herein, are sewer districts formed in accordance with the statutory provisions of the State of Wyoming. Both districts are public governmental entities, each with a board of directors elected by the residents of the respective districts.

3. On January 19, 1989, Respondents filed an application for approval of an underground waste water injection well with the Department of Environmental Quality, hereinafter referred to as "DEQ."

4. Prior to making application to DEQ for the well permit, the districts (Respondents) after initially considering some ten alternatives, went through a procedure whereby a total of five alternatives were discussed in the facility's plans submitted as part of the application for the well permit.

5. DEQ proposed that the permit requested by applicants be issued and public notice of such was apparently provided according to law. Several protests to the issuance of the permit were received by the DEQ, including one from Petitioner, Edward Knight.

6. A public hearing was held in Teton County, Wyoming on May 17, 1989 before a panel of members of the EQC. The applicants (Respondents) and DEQ were represented by counsel, and several protestants, including Petitioner, were present, and were represented by David Adams, a Wilson, Wyoming area resident.

7. On September 14, 1989 the EQC issued its Findings of Fact, Conclusions of Law and Order wherein it determined that the applicants had met their burden of demonstrating that the permit meets all statutory and regulatory requirements imposed by the State of Wyoming, and ordering that the injection well permit as revised by the Order, be issued by DEQ.

8. The Petitioner has failed to meet his burden of proof in this matter.

9. At the hearing conducted by the EQC on May 17, 1989, several witnesses testified on behalf of Respondents in this matter, including persons with engineering backgrounds, and a hydro geologist. Petitioner and those persons objecting to the issuance of the permit merely cross-examined the applicant's witnesses and presented no evidence of their own at the hearing in opposition to the issuance of the permit.

10. This Court is satisfied that the EQC's action was not arbitrary or capricious nor an abuse of discretion and that it was in accordance with law; the decision was not violative of the Petitioner's right to due process of law; the procedures utilized in the administrative hearing and decision were in accordance with law; and the decision was supported by substantial evidence.

11. The EQC gave proper consideration to the application and to the position taken by the Board of County Commission[er]s of Teton County and the EQC did not fail to properly consider the alternatives.

12. The granting of the injection well permit was in accordance with the express terms of the Water Quality Rules and Regulations of the Environmental Quality Act.

We agree and adopt the findings and decision provided by the first judicial appeal, affirm the district court and approve the decision of the EQC.

Affirmed.