2002 WY 37

**In the Matter of the Worker's Compensation Claim of Ivan L. SWEETS, Appellant (Employee–Claimant),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Objector–Defendant).**

No. 01–75.

Supreme Court of Wyoming.

March 12, 2002.

Jody L. James of James and Scott, P.C., Rock Springs, WYO, Representing Appellant.

Hoke MacMillan, Attorney General; John W. Renneisen, Deputy Attorney General; Gerald L. Laska, Senior Assistant Attorney General; and David L. Delicath, Assistant Attorney General, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, and VOIGT, JJ., and Keith G. Kautz, D.J.

HILL, Justice.

[¶ 1]  On April 9, 1997, Appellant, Ivan L. Sweets (Sweets), was injured while at work in the laundry at the Wyoming State Penitentiary (WSP).[1]  It is his claim that the

---

1. Inmates working in the Correctional Industries Program, which includes the prison laundry, are covered by worker's compensation. Wyo. Stat.

1997 injury eventually necessitated a knee surgery and other medical care for which he sought worker's compensation benefits. The Appellee, Division of Wyoming Workers' Safety and Compensation Division (Division), contends that Sweets's medical problem was the result of a 1985[2] injury he suffered while playing basketball at the WSP and, thus, the medical expenses submitted to the Division for compensation benefits were properly denied. Sweets sought review in the district court under W.R.A.P. 12. The district court certified the matter here for our review. We will reverse and remand with directions.

### ISSUES

[¶ 2]   Sweets poses these issues:

1. Was the Hearing Examiner's finding that [Sweets] did not suffer a 1997 left knee anterior cruciate ligament injury supported by substantial evidence?

2. Was the Hearing Examiner's finding that the most complete and in depth medical review was performed by Dr. Rheim Jones an abuse of discretion?

3. Was the Hearing Examiner's finding that [Sweets] suffered an April 9, 1997 left knee sprain/strain injury that resolved itself by no later than July 28, 1998 arbitrary and capricious?     .

The Division rephrases those issues thus:

I.   Does substantial evidence support the Hearing Examiner's finding that [Sweets] failed to prove that he injured his anterior cruciate ligament on April 9, 1997?

II.   Does substantial evidence support the Hearing Examiner's finding that the most complete and in depth review of

[Sweets's] condition was the one performed by Dr. Rheim Jones?

III.   Does substantial evidence support the Hearing Examiner's finding that [Sweets] sprained or strained his left knee on April 9, 1997 and that injury resolved itself by July 28, 1998?

### FACTS

[¶ 3]   This case began when Sweets filed a report of an occupational injury on April 9, 1997. In that document, Sweets reported that he was cleaning a drain in the laundry room at the WSP and his "knee went out while bending." The report indicated that Sweets injured his left knee.[3] At the time of the injury, Sweets was seen in the infirmary at the WSP, and these notations appear in his medical file:

> Mr. Sweets comes to the clinic this morning. He miss stepped [sic], his left knee popped. There may be a slight affusion; this happened just a short time ago. I have seen him in the past for his knee. Examination reveals the joint to be stable. Range of motion is normal. I am going to put a neoprine [sic] sleeve on. He is to wear it during the day for a couple of weeks. He believes he can continue with his job as a laundry supervisor. Mr. Sweets is to return to see me in two weeks. I have prescribed IBU 800 mg tid.

[¶ 4]   It is apparent from the record that the Division asked Sweets to send it a more detailed description of the circumstances surrounding his injury. Sweets wrote to the Division on April 29, 1997, and his explanation in that letter adds nothing to what has been recited above, although Sweets did provide the Division more information about the

Ann. §§ 25–13–106(a) and 27–14–401(h) (LexisNexis 2001).

**2.**   Sweets testified that the injury occurred in 1984, and the documentation related to that injury indicates that Sweets was treated at the hospital in Rawlins on April 9, 1984. A left knee arthrogram revealed that: "There was a horizontal linear defect noted in the posterior horn of the medial meniscus on the medial aspect consistent with a tear." Sweets did indicate that injury occurred in 1985, when he wrote to the Division in April of 1997. In his findings, the Hearing Examiner describes this occurrence as the 1985 injury, and we will adopt that convention to

avoid confusion. In quoted material, any reference to a 1984 injury should be construed to refer to the so-called "1985 injury."

**3.**   This fact is of importance only because the Division originally identified the injury as being to Sweets's right knee, though the report of injury clearly indicated the left knee. Other than the obvious "credibility" issues that arise when such a mistake is made, this fact is of no particular importance, as the Division promptly corrected the error when Sweets called it to the Division's attention.

injury which occurred in 1984. It is in this letter that Sweets stated that the previous injury was in 1985, and from that point forward most persons involved in treating or evaluating Sweets continued to use 1985 as the relevant date.

[¶ 5] Sweets testified that his left knee has continued to give him problems since the time of the 1997 injury, though he received no treatment for it until 1998–99, after he was released from the WSP. On July 28, 1998, Sweets paid a visit to a physician in Kemmerer, and that physician noted no instability in his left knee but suggested that an MRI be done and that Sweets return for a recheck in three weeks. Sweets did not return to Kemmerer for a recheck, but an MRI was performed on August 7, 1998, at the hospital in Rock Springs and that MRI revealed: "Complete disruption of the anterior cruciate ligament, probably chronic." Sweets asserted that he was unable to afford to go back to Kemmerer to pursue treatment, and his next treatment began with Joseph Oliver, M.D., an orthopedic surgeon from Rock Springs, on October 5, 1999. Dr. Oliver's final conclusion was that Sweets suffered a new injury on April 9, 1997, but an additional factor was a material aggravation of a 1984 injury wherein Sweets suffered a medial meniscal tear in his left knee. Dr. Oliver recommended surgery to correct the anterior cruciate ligament problem, and that surgery was performed. The costs of that surgery and its associated hospitalization make up the lion's share of the claims submitted by Sweets to the Division, which the Division declined to pay on the basis that the treatment was not related to, nor necessitated by, the April 9, 1997 injury. At this juncture, we also take note that on May 15, 1997, the Division sent Sweets a letter containing the following information:

> The Workers' Compensation Division has reviewed your accident report(s) and all other documents in our file. We have determined that the injury to your right [*sic*] knee is covered by the Wyoming Workers'[4] Compensation Act **and claims for medical and/or disability benefits**

will **be reviewed and paid if compensable.**

**The evidence, including both your own statements in a letter as well as the medical records from the prison infirmary, indicate this condition is a preexisting one. As there has never been a workers' compensation claim filed on this injury, we must assume the preexisting injury and it is not work related. Our compensability on this case is therefore limited to an acute exacerbation of the pre-existing condition. We will not accept any previous primary injury as compensable and if you do have any previous injury such as a torn medial meniscus, we would not pay for the surgical repair of this condition.**

(Emphasis in original.)

[¶ 6] On June 3, 1997, the Division sent Sweets a letter correcting its reference to his right knee and changing it to his left knee. The Division said the error came about because the report of injury did not specify which knee was involved, although that too is not correct. The letter went on to say:

> As the records do indicate your left knee injury is an aggravation of a pre-existing condition, and there was never a workers' compensation [*sic*] filed on your left knee the Division's compensability is limited to an acute exacerbation of the pre-existing condition. We will not accept any *previous* injuries as compensable and if you have any *previous* injury such as a torn medial meniscus, we would not pay for the surgical repair of these conditions. If the records, however, clearly indicate a condition attributable to the injury of April 9th, 1997, we will consider payment for repair of the condition.

(Emphasis in original.)

[¶ 7] A disclosure statement filed by the Division with the Office of Administrative Hearings on March 22, 2000, indicated that the Division took the position that the problems with Sweets's left knee were pre-existing, that the problems with his left knee did not occur in the course and scope of his

---

4. Although the Division calls itself the "Wyoming Workers' Compensation Division," the Act is actually entitled the "Wyoming **Worker's** Compensation Act."

employment, and that Sweets had the burden of proving each and every element of his claims for medical and temporary total disability benefits by a preponderance of the evidence.

[¶ 8] At the request of the Division, Sweets was sent to Rheim B. Jones, M.D., an orthopedic surgeon in Idaho Falls, Idaho,[5] for the purpose of undergoing an independent medical examination. We will discuss that evaluation more fully later, but for the time being, we note that Dr. Jones determined that:

Mr. Sweets sustained a basketball injury to his left knee in 1985, while incarcerated in the Wyoming State Penitentiary. Dr. Kirsch diagnosed a medial meniscal tear. It is my opinion, based on the medical record, Mr. Sweet's [sic] testimony [6] [sic], chronology of his symptoms, and x-ray findings, that Mr. Sweets sustained an anterior cruciate ligament injury in 1985. It went undiagnosed. The unstable knee and torn medial meniscus caused the degenerative arthritis.

The injury of 04/09/97 did not cause the anterior cruciate ligament tear and the resulting arthritis. The incident of 04/09/97 represented an episode of instability from the pre-existing torn anterior cruciate ligament and medial meniscal tear.

[¶ 9] Dr. Jones also indicated: "Since 1985, Mr. Sweets has been unable to play basketball, football, fish, and do his climbing activities." This conclusion is at odds with Sweets's testimony as well as the reports filed by all other health care providers. According to Sweets, and there is no other evidence to contradict it, he was able to do all of his activities, including work, until after the April 9, 1997 injury.

[¶ 10] The Division also sent Sweets to Michael Kaplan, M.D., at Gem City Bone & Joint in Laramie for an independent medical evaluation. Dr. Kaplan specifically challenged Dr. Jones's statement that Sweets was unable to play sports, etc., and indicates

the opposite was true. In addition, Dr. Kaplan opined:

Dr. Jones's opinion in the IME is that 100% of the patient's problems should be apportioned to the accident in 1985. However, with a severe anterior cruciate deficiency, I would have expected the patient to have had problems with instability and with all of the activity that he claims he participated in. Additionally, it seems that he may have been denied appropriate serial assessments and diagnostics following the Workers' Compensation injury in 1997, delayed care until 1999.

[¶ 11] Dr. Oliver, Sweets's treating physician, also commented on Dr. Jones's evaluation:

I have read Dr. Jones' evaluation and I feel that the injury that Mr. Sweets sustained in 1985 was a probable meniscal tear. He gave no history of problems up until his injury in 1997. After that injury he had significant problems with his knee with instability and giving out. It is my feeling that he did have injury in 1985, which was probably a meniscal tear, but he was able to function up until 1997 with this, which is not unusual to have people function with a torn meniscus for some period of time without being symptomatic. I have a number of patients in my practice that this has happened to. As far as him having significant problems after his injury of 1997, I feel that his cruciate deficiency developing from that injury and his instability after that time was a result of that second injury of 1997.

I do not agree that 100 per cent of Mr. Sweets['s] problems are related to his injury of 1985. Again as related to me by Mr. Sweets, he had minimal problems with his knee up until his injury of 1997 when his knee got progressively worse. I feel that the tearing of his anterior cruciate ligament at the time of this injury caused his symptoms to get worse and progress, as far as instability. His knee became unstable to the point that he was more sympto-

---

5. Idaho Falls is approximately 350 miles from Rock Springs.

6. Sweets's testimony was not given until November 17, 2000. We must assume that Dr. Jones means Sweets's report to him during the examination.

matic after the anterior cruciate ligament injury in 1997.

As stated above, I feel to have a meniscal tear does not necessarily mean that your knee is going to be unstable and the function can be relatively normal, which I feel Mr. Sweets was from his injury in 1985 to his injury in 1997 when he got progressively worse.

[¶ 12] A hearing was held on November 17, 2000. The only evidence taken at that hearing was Sweets's testimony. The remainder of the record is made up of a deposition from Dr. Oliver, the various medical reports described above, and documents of an administrative nature. The Hearing Examiner generally denied Sweets's claim for worker's compensation benefits.

## STANDARD OF REVIEW

[¶ 13] Our standard of review in a case such as this is well established:

A claimant for worker's compensation benefits has the burden of proving all the essential elements of the claim by a preponderance of the evidence in the contested case hearing. *Martinez v. State ex rel. Wyoming Workers' Compensation Div.*, 917 P.2d 619, 621 (Wyo.1996). When an agency decides that the party charged with the burden of proof has failed to meet that burden, the case is reviewed under the "[a]rbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" language of Wyo. Stat. § 16–3–114(c)(ii) (1990). *City of Casper v. Utech*, 895 P.2d 449, 452 (Wyo.1995). On appeal the complainant, Pederson in this instance, has the burden of proving arbitrary administrative action. *Knight v. Environmental Quality Council of State of Wyo.*, 805 P.2d 268 (Wyo.1991); *Wyoming Bancorporation v. Bonham*, 527 P.2d 432, 439 (Wyo. 1974); *Marathon Oil Co. v. Welch*, 379 P.2d 832, 836 (Wyo.1963); *Whitesides v. Council of City of Cheyenne*, 78 Wyo. 80, 319 P.2d 520, 526 (1957). The agency, as the trier of fact, is charged with weighing the evidence and determining the credibility of witnesses. *Utech*, 895 P.2d at 451, and cases there cited. The deference normally accorded to the findings of fact by a trial court is extended to the administrative agency, and the agency's decision as to the facts will not be overturned unless it is clearly contrary to the overwhelming weight of the evidence. *Wyoming Steel & Fab, Inc. v. Robles*, 882 P.2d 873, 875 (Wyo.1994). Demonstrating evidentiary contradictions in the record does not establish the irrationality of the ruling, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it. *Matter of Corman*, 909 P.2d 966, 971 (Wyo.1996); *Knight*, 805 P.2d at 274; *Ward v. Board of Trustees of Goshen County School Dist. No. 1*, 865 P.2d 618, 623 (Wyo.1993); *State ex rel. Wyoming Workers' Compensation Div. v. Ramsey*, 839 P.2d 936, 941 (Wyo. 1992).

*Ikenberry v. State ex rel. Wyoming Workers' Compensation Division*, 5 P.3d 799, 802 (Wyo.2000) (citing *Claim of .Pederson*, 939 P.2d 740, 742 (Wyo.1997)).

## DISCUSSION

[¶ 14] Based upon the evidence in the record, the Hearing Examiner made the following determinations, which are of particular importance to the resolution of this matter. We agree with Sweets that his findings are incorrect and/or inaccurate as asserted in Sweets's statement of the issues:

[¶ 15] 1. The Hearing Examiner found that Sweets injured his knee in 1985 while playing basketball, and that the injury which occurred was a torn medial meniscus, but that problem was not treated until surgery in October of 1999. Viewing the same materials, which were available to the Hearing Examiner, we conclude that the injury occurred in 1984, and it was diagnosed as a medial meniscus tear. However, that tear was not treated during the 1999 surgery, or at least no claim was made for repair of the medial meniscus. The claim was for surgery to correct the anterior cruciate ligament deficiency.

[¶ 16] 2. The Hearing Examiner determined that great weight should be given to Dr. Jones's findings because they were the

most complete and in-depth review done. Again, based on our review of the record we note that, indeed, Dr. Jones's report is some 34 pages long, but unless we are to use the phrase, "weight of the evidence," literally, it should carry no more weight than any of the other medical evidence. Only a few of the 34 pages pertain to the issue at hand. Of special note is that Dr. Jones is the only health care provider to conclude that Sweets was unable to play sports or work after the 1985 injury. The vast weight of the evidence compels a conclusion that that is patently incorrect and seriously detracts from Dr. Jones's overall conclusions.

[¶ 17]    3.    The Hearing Examiner concludes that Sweets did suffer a work-related injury on April 9, 1997, but that injury resolved itself no later than July 28, 1998. Our review of the record reveals that there is no medical evidence to support this conclusion. This is apparently based upon the fact that on July 28, 1998, a physician in Kemmerer saw Sweets, and she found no instability in the knee. That same physician wanted to see an MRI. An MRI was done about ten days later, and it revealed a complete anterior cruciate ligament deficiency. If the Hearing Examiner's reasoning were to be followed, then it also would have to be concluded that the deficiency occurred during that ten-day time span, and there is no evidence in the record to support such a conclusion. Moreover, because such a conclusion requires medical expertise, we view the Hearing Examiner's findings in this regard to be beyond the scope of his role in this process.

## CONCLUSION

[¶ 18]    The errors in the Hearing Examiner's findings so undermine the credibility and, hence validity, of the result reached in this case that the Order Finding and Limiting Compensable Injury cannot be affirmed. Therefore, we reverse that Order and remand to the district court with directions that the district court further remand to the Office of Administrative Hearings. At a minimum, the Hearing Examiner shall amend his findings so as to conform them to the evidence in the record and issue a new order.

The Hearing Examiner may also choose to remand the matter back to the Division for a hearing *de novo* before the Medical Commission, or to enter an order awarding benefits as claimed by Sweets, as there is substantial evidence in the record to support such an award of benefits.