SUN RIDGE DEVELOPMENT, INC., f/k/a Century West, Inc., a Wyoming corporation, Appellant (Plaintiff),

v.

The CITY OF CHEYENNE, a municipal corporation, Appellee (Defendant).

No. 88–317.

Supreme Court of Wyoming.

Feb. 20, 1990.

584

William D. Bagley, Cheyenne, for appellant.

John A. Sundahl of Godfrey and Sundahl, Cheyenne, for appellee.

LEHMAN, District Judge.

Sun Ridge Development, Inc. (Sun Ridge),[1] f/k/a Century West, Inc., filed suit against the City of Cheyenne (City) in district court on September 24, 1987, alleging, *inter alia*, an unconstitutional taking arising from the City's use of a building moratorium to regulate Sun Ridge's subdivision development, Crest Ridge.[2] After a six-day bench trial, the court filed, on October 13, 1988, its "Findings of Fact and Conclusions of Law." The court found that the moratorium was a reasonable response in light of Sun Ridge's failure to submit design plans to address and correct the ongoing drainage problems created by the Crest Ridge development. The court also found that the subdivision regulations, which required Sun Ridge to submit the design plan, constituted a valid and legitimate exercise of the City's police power.

We affirm.

■ The parties present a number of issues for resolution.[3] For purposes of this appeal, however, a single inquiry suffices:

---

1. Sun Ridge is the successor in interest to Century West, Inc.

2. Crest Ridge encompassed 127.12 acres of unimproved land when the City annexed it on February 26, 1979.

3. Sun Ridge lists the following issues:
   "1. Was the City's initial moratorium reasonable as to the north parcel and as to the south parcel?
   "2. Was the length of the moratorium as to either the north or south parcel excessive and unreasonable?
   "3. Did the moratorium frustrate Plaintiff's investment backed expectations?
   "4. What was the length of the moratorium?
   "5. Was there an applicable drainage standard, and, if so, was it violated?
   "6. Were the actions of the City a valid exercise of its police power? And if it was, does that relieve the City of liability to one who has been subjected to a taking?"

The City responds with its own restatement of the issues:
   "1. Whether Approval of a Plat or Re-plat Deprives A Governing Body of the Right to Require Compliance With Its Subdivision Regulations Concerning Drainage?
   "2. Whether Appellant's Claims For Breach of Contract, Promissory Estoppel, Implied

Whether the City's imposition of a construction moratorium to enforce its drainage regulations was a valid exercise of its police power.

For the reasons set forth below, we find that the City's actions promoted the general welfare of those residents affected by the drainage problems in a manner consistent with the basic notions supporting the exercise of its police power. Because we believe this case turns upon whether the City's use of its police power was proper, only those facts which are relevant to that inquiry are discussed.

In July of 1978, the City amended its subdivision regulations to establish drainage design standards to promote "the orderly development of land in the City * * *." Specifically, the regulations were intended to "insure that resulting changes [from development] in the quantity * * * of surface water drainage are not detrimental to the City * * *." The regulations governing "Land Development" placed

"[t]he primary responsibility for the planning, design and construction of drainage improvements required in conjunction with land development * * * in the person or party who is developing the land."

They stated in pertinent part:

"Historical flow patterns and runoff quantities shall be maintained in such a manner as to reasonably preserve the natural character and appearance of ex-

isting drainage ways, and to prevent property damage and physical changes of the type generally attributed to increases in runoff rate, volume, and velocity [due to] storm water."

In addition,

"Provisions shall be made in the planning and development of land to provide for the temporary and/or permanent storage of surface water runoff * * *. The cumulative effect shall be to preserve the existing [pre-development] flow characteristics."

The regulations also provided that "[d]uring the development of land, care shall be exercised by the Developer to preserve the quality of surface water runoff." The City adopted further amendments to its subdivision regulations in May of 1979 (1979 regulations).[4]

The parties recognized that drainage problems existed in the Buffalo Ridge residential area when Sun Ridge applied for annexation of Crest Ridge on December 21, 1978. On February 26, 1979, Crest Ridge was annexed to the City. In an effort to alleviate the drainage problems, the City and Sun Ridge entered into an agreement on April 24, 1979 (1979 Agreement), to implement a drainage study (referred to by the parties as the Section 21 study) as a preliminary step toward creating an improvement district.[5]

Contract and Inverse Condemnation are Barred By Its Failure to File A Claim?
"3. Whether The 37 Day Moratorium on Building Permits Issued by The City of Cheyenne Amounts To An Unconstitutional Temporary Taking of Appellant's Property?
"4. Whether Appellant's Claims Are Barred For Failure to Exhaust Administrative Remedies?"

4. The 1979 regulations adopted the 1978 drainage design standards. Consequently, the developer's obligation to comply with the 1978 drainage design standards was not altered by the 1979 regulations. For purposes of clarity, the 1979 drainage regulations will be cited to in the remainder of this opinion.

5. The district, if implemented through a vote of the residents, was intended to solve storm drainage problems in the developed or developing areas adjacent to the Crest Ridge area and also involving Crest Ridge. It would have financed

the drainage controls by assessing each lot in the Section 21 area an equal amount.

After the proposed improvement district was discarded as an option, see infra p. 586, certain language contained in the 1979 Agreement and the differing interpretations of it, specifically the last paragraph of III.D. pp. 66–67, triggered a dispute between the parties vis-a-vis their respective obligations. The 1979 Agreement provided, in part, that:

"Having concluded that the improvement district should not or cannot be created, the City agrees that * * * [Sun Ridge has] satisfied all possible obligations that can be imposed upon them to provide for drainage improvements within drainage improvement district area. The City, therefore, agrees that it shall not deny the development of properties within Section 21 on the basis of inadequate drainage facilities and that * * * [Sun Ridge] may continue the development of properties within Section 21 subject to the existing regula-

On August 27, 1979, the City approved a plat for Crest Ridge Addition, Second Filing. Initial development consisted of 45 lots on the south edge of the Crest Ridge development which was immediately to the north of existing homes and located on the side of a steep slope.

Shortly after the Second Filing, Sun Ridge began to develop Crest Ridge. By early September, 1980, the natural vegetation had been stripped off the initial development of 45 lots. The effect of the excavation was to worsen the drainage problems in and immediately below Crest Ridge. Beginning in the fall of 1980, excessive amounts of water, dirt, and silt flowed off the Crest Ridge addition causing repeated and severe flooding into the homes and lots immediately below the subdivision. Downstream residents, the unhappy recipients of Crest Ridge's drainage problems, lodged numerous complaints with the City and Sun Ridge. The continuing erosion required the City to participate in repeated and expensive clean-up efforts. Temporary measures to control the erosion were also initiated (e.g., Sun Ridge constructed diversion dikes from hay bales).

By July of 1981, it was evident that the majority of property owners believed that the cost for solving the drainage problems should not be placed upon them, and if the proposed improvement district were put to a vote, they would not support it. The improvement district which was the subject of the 1979 Agreement never materialized. Meanwhile a homeowner's group, known as the Northeast Cheyenne Protective Association, had asked the City to place a moratorium on further development in Crest Ridge until the drainage issue had been satisfactorily resolved.

On August 24, 1981, the matter came before the City Council. A moratorium on all further activity was rejected by the City, and instead, development was restricted to paving and seeding until October 1, 1981. The terms of the moratorium provided that, for a period of 37 days, no further building permits were to be issued for the Crest Ridge subdivision. The City believed that a moratorium would be a reasonable way to address Sun Ridge's failure to implement a plan to correct the Crest Ridge drainage problem and its adverse effect on the downstream residents' general welfare.

Realizing that the improvement district was no longer a viable option because the residents were against the $1500 lot assessment it would cost to implement the district,[6] the City asked Sun Ridge to comply with the 1979 drainage regulations and submit a detailed drainage plan. Relying upon the language of the 1979 Agreement,[7] Sun Ridge responded that it had satisfied all subdivision regulations concerning drainage when it agreed to participate in the proposed improvement district, and therefore, it need not submit a drainage plan. In other words, the only condition the City had imposed on Sun Ridge for the re-plat of Crest Ridge was the 1979 Agreement to participate in the improvement district; and after the approval of the re-plat on August 27, 1979, no additional conditions (specifically, the 1979 drainage regulations) could be imposed.

The City's position was that Sun Ridge knew, when it executed the 1979 Agreement, that it would have a continuing responsibility to address the runoff created by the Crest Ridge development regardless of whether the proposed improvement district was created. According to the City, the improvement district would be used as

tions of City ordinances and development codes."

Sun Ridge argued that the terms of the 1979 Agreement absolved it of any further compliance with subdivision regulations concerning drainage, if the proposed district failed to materialize. The City argued that Sun Ridge's compliance with the 1979 drainage regulations was not contingent on the creation of an improvement district. In other words, Sun Ridge's obligation to deal with the runoff from Crest Ridge

existed regardless of whether the district was approved or not approved. *See infra* p. 586.

The court noted that the 1979 Agreement was not prepared by representatives of the City, was not submitted to the City Attorney for review, and was not submitted to the City Council for approval.

6. *See supra* note 5.

7. *See supra* note 5.

a means to finance the construction and implementation of drainage facilities; however, the creation of the district would not relieve Sun Ridge of its obligation to comply with the 1979 drainage regulations.

Negotiations to resolve the Crest Ridge issue, through letters and meetings from January 1982 to February 1984, were continually derailed by Sun Ridge's insistence that its obligation to comply with applicable drainage regulations ended with the collapse of the improvement district. Finally on February 27, 1984, the parties reached an agreement which acknowledged that "[a] difference of interpretation has existed regarding [Sun Ridge's] obligations for drainage control under the previously executed agreement dated April 1979, [1979 Agreement] between City and [Sun Ridge]." The February 1984 agreement also provided that Sun Ridge would contribute financially in the construction of drainage improvements for the Crest Ridge area, and thereby, satisfy the City's drainage requirements.

Sun Ridge claims that, notwithstanding the February 27, 1984 agreement, the City continued to restrict development until June 6, 1986, when development was allowed to resume. The record, however, offers no clues on why Sun Ridge, if its claim was true, waited until September 24, 1987, to file suit against the City. It is also not clear why Sun Ridge chose not to seek a variance from the regulations or pursue an appeal from any of the adverse decisions it now alleges occurred.[8]

After a bench trial conducted on September 26–30 and October 4, 1988, the court filed its "Findings of Fact and Conclusions of Law" on October 13, 1988. The court concluded that Sun Ridge's claim of an unconstitutional taking must fail because the moratorium was a reasonable exercise of the City's police power. The court's conclusion was based, in part, on its finding that:

"The moratorium addressed a serious problem at hand which required correction; to wit: flooding and property damage and potential health hazards to citizens of the City associated by inadequate drainage control facilities on Crest Ridge addition, and the moratorium was a logical way to address such problem until the drainage corrections were proposed, accepted, and implemented."

It was the court's opinion, after reviewing the evidence, that the "serious problem" with drainage was due to the Crest Ridge development. There had been a significant increase in the runoff rate, volume and velocity of water, and this increase caused the peak rate of flow after development to exceed the peak rate of flow before development. The result was that the downstream residents suffered serious and significant flooding, siltation, and erosion.

The court found, based in part on the testimony of Frank J. Trelease, a hydrologist and engineer, that Sun Ridge should have known that the development of Crest Ridge would result in a significant increase in runoff and potential drainage problems if corrective measures were not included as part of the development. He testified that in April of 1979, as a consultant, he performed calculations site-specific to Crest Ridge that revealed a significant increase in runoff if the proposed development occurred. The calculations revealed that south of the ridge line (the south drainage) the rate of flow and the volume of flow would increase by as much as three times that of pre-development conditions.

The court decided that the 1979 subdivision regulations constituted a valid and legitimate exercise of the police power because they encouraged compatible development and promoted the public health, safety, morale, and general welfare of the residents. The regulations also substantially advanced the City's interests in a rational, logical, and appropriate manner. In short, the court found that enforcement of the regulations was directly connected to the public's safety. The court also noted that the subdivision regulations were properly implemented under the Wyoming Statutes.

The court found that the 1979 Agreement did not eliminate Sun Ridge's obli-

8. *See infra* note 11.

gation to comply with the applicable drainage regulations. Specifically the court found that under the regulations, it was the developer's responsibility to prepare and submit to the City Engineer a final drainage plan to control erosion and runoff before beginning construction. The court then chronicled ten different violations of the subdivision regulations by Sun Ridge:

"(a) The plaintiff [Sun Ridge] never submitted drainage plans which would accommodate the increased runoff and detain it on site.

"(b) The plaintiff never provided calculations concerning historical flow patterns and runoff quantities.

"(c) The plaintiff never submitted a drainage plan which addressed runoff rate, volume, velocity, diversion, and concentrations of storm water.

"(d) The plaintiff did not propose or implement surface water storage areas.

"(e) The plaintiff did not provide adequate temporary or permanent siltation ponds or dams, nor did it prevent soil from being carried off [the] development area by runoff waters.

"(f) The plaintiff did not develop or implement drainage facilities such that the peak rate of storm water discharge that occurred at the downstream boundary discharge points, after completion of the project, would not exceed the peak rate of storm water discharge that would occur from the undeveloped land or existing conditions, at the same discharged locations, for an event equal to the 50 year frequency storm.

"(g) The plaintiff did not provide adequate surface water runoff collection systems such as grass drainage swales, improved and surfaced drainage ditches, or culverts.

"(h) The plaintiff did not provide for adequate drainage grading for individual lots.

"(i) The plaintiff did not implement permanent quality controls to deal with permanent erosion and sedimentation control measures.

"(j) The developer did not submit a preliminary drainage plan required by the subdivision regulations or submit a final plan."

Relying upon these violations, the court reasoned that "[t]he health, welfare and safety of the inhabitants and residents of the City demanded protection from flooding, siltation, wind, and water erosion from the Crest Ridge subdivision." Accordingly, the court found that the

"moratorium imposed upon building permits was an appropriate and reasonable response to ongoing drainage problems and the refusal on the part of the developer to submit plans to correct the drainage problems. It was further appropriate in light of the developer's refusal to implement on-site storage facilities. The subdivision regulations prohibit development until plans to correct drainage flows are submitted and approved. The Court further finds that the moratorium substantially advanced a legitimate governmental interest by a rational means. The subdivision regulations prohibited continued development without compliance with such regulations. The defendant [City] was faced with no other options or choices to address the problem in the absence of a moratorium in light of the plaintiff's refusal to address and correct the drainage problems associated with his development."

The court, in response to Sun Ridge's argument that all applicable drainage regulations for annexation had been fulfilled per the 1979 Agreement, ruled that the language of the 1979 Agreement was ambiguous.[9] The court found that,

"on the one hand, it seems to say to [Sun Ridge] that the drainage regulations have been met if the proposed district were to fail; while, on the other hand, it requires that further development would be subject to existing regulations and development codes."

The court then went on to rule that Sun Ridge's "interpretation is not reasonable because it would allow the City to declare that the development code had been met

9. *See* note 5 *supra.*

when in fact it had not been met." The court reasoned that "[t]his [would be] tantamount to the City surrendering its enforcement power." In other words, according to the court, under Sun Ridge's interpretation the citizens would have no voice in the decision to allow the development to adversely impact their lands.

The court also noted that the City Engineer executed the 1979 Agreement without the City's approval. The City Engineer was not authorized to surrender the City's enforcement power, nor was that his intention. The court believed that even the City could not "surrender by contract its obligation to enforce the drainage regulations particularly when the health and safety of its citizens [were] involved." The court concluded that

"the most reasonable interpretation which can be placed upon the language * * * require[s] [Sun Ridge] to conform to the drainage regulations while undertaking development within Section 21 after the drainage district failed to come into being."

When reviewing a decision under a sufficiency of the evidence standard,

"we uphold the judgment if there is evidence to support it, and in so doing we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without considering any contrary evidence." *Smithco Eng'g, Inc. v. Int'l Fabricators, Inc.*, 775 P.2d 1011, 1015 (Wyo.1989).

In this instance, there is sufficient evidence to uphold the trial court's finding that no taking occurred when the City, acting pursuant to its police power, placed a temporary moratorium on Sun Ridge's continued development of Crest Ridge.

We stated in *Cheyenne Airport Bd. v. Rogers*, 707 P.2d 717 (Wyo.1985), that the police power is the "government's ability to regulate private activities and property usage without compensation as a means of promoting and protecting the public health, safety, morals and general welfare." *Id.* at 726. We have also recognized that the "[p]olice powers are an essential attribute of the state as sovereign and cannot be bargained or contracted away." *State Highway Commission v. Sheridan–Johnson Rural Electrification Ass'n*, 784 P.2d 588 (Wyo.1989). The United States Supreme Court acknowledged that the issue of whether a compensable taking has occurred may be avoided if the governmental land use regulation at issue was undertaken for safety reasons. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 311–15, 107 S.Ct. 2378, 2384–85, 96 L.Ed.2d 250 (1987).

■ For a city's use of its police power to be valid, the matter must, first, be a proper subject of regulation. *See Cheyenne Airport Bd.*, 707 P.2d at 727. Drainage problems due to development, and the safety hazards they create for the public, are unquestionably proper subjects of regulation. Sun Ridge does not dispute that the City has a right to impose drainage regulations in order to insure that developments do not create drainage concerns. Sun Ridge argues, instead, that the 1979 drainage regulations are not applicable to it because of the 1979 Agreement to participate in the improvement district. The trial court addressed Sun Ridge's argument when it found that the 1979 Agreement was ambiguous and that the interpretation the City advocated was the correct one.

■ The means the City uses to implement the drainage regulations must be reasonable. *See id.* The court found that the City had properly enacted its 1979 regulations. The court also found that the City had no choice, due to Sun Ridge's noncompliance with the applicable regulations, but to impose a moratorium. We find nothing objectionable with the City's reasonable use of a moratorium to protect and promote the public's general welfare. In short, the City's power to enact valid regulations must, also, include the power to enforce those regulations.

■ When a developer's noncompliance with drainage regulations jeopardizes the public's safety, a city's use of its police power—if reasonable—to enforce those regulations does not constitute a regula-

tory taking for which compensation is due. Sun Ridge's development of Crest Ridge created severe drainage problems for downstream residents. The City informed Sun Ridge that it needed to submit a drainage plan to address these problems. Sun Ridge, however, continued to insist that it was not required to comply with the 1979 drainage regulations. Given Sun Ridge's refusal to comply with applicable drainage regulations, the City was justified in imposing a moratorium restricting development to paving and seeding. The City's use of a moratorium to enforce its valid regulations is a reasonable exercise of its police power. *See Estate of Scott v. Victoria County,* 778 S.W.2d 585 (Tex.Ct.App.1989) wherein the Texas court upheld, against an attack by developers, Victoria County's use of its police power to impose a moratorium on further issuance of sewer permits.

The court found that the moratorium lasted only 37 days. Sun Ridge argues on appeal that it lasted 2½ years. The record indicates, however, that Sun Ridge was not in compliance with the 1979 drainage regulations until, at least, the February 27, 1984 agreement.[10] During this period of interminable delay, the quality of life for the downstream residents was declining. Based upon Sun Ridge's recalcitrance (it essentially ignored an obvious drainage problem), we find nothing objectionable about the City's reasonable use of a moratorium, even if it extended beyond 37 days, to enforce regulations designed to promote the public's general welfare.[11]

Affirmed.

10. *See supra* pp. 586–87.

11. Sun Ridge also alleges that, notwithstanding the parties' February 1984 agreement, a "cloud" continued over the Crest Ridge development until June 6, 1986. Sun Ridge, however, waited until September 24, 1987, to file suit. If Sun Ridge believed that the 1979 regulations were not applicable or that the City was reneging on its February 1984 agreement, it should have—at an early date—either entered into serious negotiations with the City to resolve the issue or challenged the regulations in court. *Cf. First English,* 482 U.S. at 307–09, 107 S.Ct. at 2382 (the plaintiffs filed suit a month after the moratorium was enacted).