The TOWN OF WHEATLAND,
Appellant (Plaintiff),

v.

BELLIS FARMS, INC.; M.C. Short; Delmar H. Landen; Jean Landen; Allen L. Cook; Carol A. Cook; Thomas R. Burns; Barbara A. Burns; County of Platte, State of Wyoming; Jesse Jenkins; John Wilhelm; Janet Wilhelm; James Wilhelm; Cheryl Wilhelm; and Federal Land Bank of Omaha, Appellees (Defendants).

BELLIS FARMS, INC.; M.C. Short; Allen L. Cook; Carol A. Cook; Jesse Jenkins; John Wilhelm; Janet Wilhelm; James Wilhelm; and Cheryl Wilhelm, Appellants (Defendants),

v.

The TOWN OF WHEATLAND,
Appellee (Plaintiff).

Nos. 89–180, 89–181.

Supreme Court of Wyoming.

Feb. 19, 1991.

Frank J. Jones, Douglas W. Weaver, Wheatland, for Town of Wheatland.

Kim D. Cannon and Anthony T. Wendtland, Sheridan, for Bellis Farms, Inc., et al.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

In this eminent domain appeal, the principal issue is whether the district court correctly applied W.S. 1–26–504(a)(ii) of the "Wyoming Eminent Domain Act."[1]

The town of Wheatland decided to extend the runway of its local airport. The project required the town to acquire from several landowners acreage that was mostly irrigated and nonirrigated farmland. In August 1988, the town ended its attempt to negotiate a purchase price and instead initiated condemnation proceedings.[2] Following a hearing[3] the district court ruled, *inter alia*, that the town failed to establish

---

**1.** The act, now W.S. 1–26–501 through 1–26–817 (June 1988 Repl.), was adopted in 1981. For a brief overview *see* E. Rudolph, *Wyoming Local Government Law,* § 6.2 (1985): "Eminent domain proceedings are now largely governed by the Wyoming Eminent Domain Act, enacted in 1981, and Rule 71.1 of the Wyoming Rules of Civil Procedure, adopted in 1965." *See also* Comment, *Wyoming Eminent Domain Act,* 18 Land & Water L.Rev. 739 (1983).

   Section 1–26–504. Requirements to exercise eminent domain.

   (a) * * * the power of eminent domain may be exercised to acquire property for a proposed use only if all of the following are established:

   (i) The public interest and necessity require the project * * *;

   (ii) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury; and

   (iii) The property sought to be acquired is necessary for the project.

Whether the condemnor has satisfied each element of W.S. 1–26–504(a) is a justiciable issue in Wyoming. *See Johnson County Board of County Commissioners v. Atter,* 734 P.2d 549, 552 (Wyo. 1987).

**2.** The condemnation would result in the town's gaining fee ownership of thirty-eight acres and a clear zone aviation easement of six acres.

**3.** W.R.C.P. 71.1(e) defines the hearing's parameters.

that the project was planned or located in a manner that would be most compatible with the greatest public good and the least private injury. The district court also denied the landowners' application for attorney fees.

The town raises three issues:

A. Did the district court judge improperly substitute his judgment for that of a legislative body by failing to grant the request of plaintiff's complaint?

B. Are the findings of the trial court judge supported by evidence?

C. Are defendants entitled to recover their litigation expenses?

The landowners raise two issues:

1. Was the town of Wheatland required to prove the requirements set forth in Wyo.Stat. § 1–26–504(a) in this case by a preponderance of evidence?

2. Is the Trial Court's determination that the Wheatland airport extension proposal did not meet the mandatory requirements of Wyo.Stat. § 1–26–504(a)(ii) (June 1988 Repl.) supported by substantial evidence?

In their cross-appeal, the landowners raise an additional issue:

1. Was the trial court statutorily required to award Bellis Farms, et al. their reasonable attorney's fees?

We affirm.

## THE SECTION 504(a)(ii) REQUIREMENT

The town claims that the district court misapplied W.S. 1–26–504(a)(ii) and for support cites *Johnson County Board of County Commissioners v. Atter*, 734 P.2d 549 (Wyo.1987). We disagree. The *Atter* case turned on the public necessity requirement found in W.S. 1–26–504(a)(i) and, therefore, did not reach the additional greatest public good/least private injury requirement found in W.S. 1–26–504(a)(ii).

■ The role of the district court was discussed in *Atter*. In an eminent domain proceeding, the district court reviews the condemnor's actions vis-a-vis the three statutory requirements found in W.S. 1–26–504(a). To comply with W.S. 1–26–504(a)(ii), the town[4] needs to present evidence that it has planned or located the project in a manner most compatible with the greatest public good and the least private injury.[5] The district court then reviews the evidence and decides whether the town has met its burden. Once W.S. 1–26–504(a)(ii) has been complied with and the landowners still wish to contest the action, the burden shifts to them to show that the condemnor acted in bad faith or abused its discretion as to that particular determination. *Atter*, 734 P.2d at 553.

In this instance, the district court found that the town had presented insufficient evidence to demonstrate that it planned or located the project in a manner *most* compatible with the greatest public good and the least private injury.[6] The district court, in a letter to counsel, addressed what the town needed to do to comply with W.S. 1–26–504(a):

In my ruling, I did not intend to hold that the property in question could not be condemned. I intended to say that the condemnation procedures instituted by the town of Wheatland were deficient and inadequate, and that there was a failure of proof. This is not to say that the town cannot condemn this land, if they follow the correct procedures and make the required proofs.

---

**4.** A town does not fall within the definition of a "state agency" as defined in W.S. 1–26–504(b) and, therefore, its condemnation action is subject to a more stringent review. *See* W.S. 16–3–101(b)(i) and (x) (Oct.1982 Repl.); and *Atter*, 734 P.2d at 553.

**5.** In *Atter* this court stated, "the district court must look beyond the language of the resolution and examine the facts underlying the * * * determination * * *." *Id.*, 734 P.2d at 553 n. 6. The landowners attempt to use this statement to

argue that the condemnor must prove the factual elements set out in W.S. 1–26–504(a) by a preponderance of the evidence. We disagree; evidence that the town has complied with the statutory requirement is sufficient.

**6.** We emphasize the word "most" because the legislature's use of it requires that the town devote time to the planning/locating of a project before it exercises its power of eminent domain.

The above letter does not reflect a district court's "substituting its judgment" for that of elected officials; rather, it reflects a district court's reviewing the evidence and applying a clear legislative directive to the facts.[7] The district court, over the course of a two-day hearing, heard testimony from twenty-six witnesses and reviewed over seventy exhibits before making its decision.

The district court reviewed the evidence and found that the proposed condemnation would "substantially interfere with the existing irrigation system upon which the farm land adjacent to the proposed condemnation is dependent and cause other private harm * * *." The district court detailed in extensive findings the various types of private injury the project would cause if the condemnation went forward as planned: impairment of irrigation, impairment of prime agriculture land, and excessive private damage due to the location of the new road. The district court concluded that 520 acres of irrigated farm land would suffer "substantial private harm" from the condemnation. *See State Etc. v. Standley Brothers*, 215 Mont. 475, 699 P.2d 60 (Mont.1985).

■ When we review a district court's decision

"we uphold the judgment if there is evidence to support it, and in doing so we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without considering any contrary evidence."

*Sun Ridge Development v. City of Cheyenne, Inc.*, 787 P.2d 583, 589 (Wyo.1990) (quoting *Smithco Engineering, Inc. v. International Fabricators, Inc.*, 775 P.2d 1011, 1015 (Wyo.1989)).

■ We hold there was sufficient evidence to support the trial court's ruling that the town failed to locate or plan the project "in a manner most compatible with the greatest public good and the least private injury."

## THE SECTION 504(a)(i) REQUIREMENT

The condemnor must also comply with W.S. 1-26-504(a)(i) and present evidence that the public interest and necessity require the project. The district court, in applying this section, appears to have balanced the minimal increase in safety, if the project was completed, against other factors and found this minimal increase insufficient to satisfy the public interest/necessity requirement.

■ The language of W.S. 1-26-504(a)(i) does not permit the district court to balance the competing interests. Once the town presents evidence that the project will increase safety, it has met its burden as to that particular determination. The burden then shifts to those opposing the condemnation to present evidence of bad faith or abuse of discretion. *See Atter*, 734 P.2d at 553.

The town has filed a second condemnation action involving essentially the same parties and issues. Therefore, if this case goes before the district court a second time, it should review the evidence and determine whether the town has shown that the project will increase the safety of the airport. Once the town has established that the project will increase safety and the landowners are not able to demonstrate that the town acted improperly, the court should next review whether the evidence demonstrates that the town has planned or located the project in a manner most compatible with the greatest public good and least private injury.

## ATTORNEY FEES

Finally, we address whether the landowners are entitled to attorney fees. In its amended judgment, the district court de-

---

**7.** Contrary to the town's claim, judicial review of a condemnation action does not involve a judicial displacement of a legislative body's judgment; it involves the judicial application of a state statute that requires the courts to determine whether a condemnor has abused its discretion through a taking that is not compatible with the greatest public good and least private injury. *Emerald PUD v. Pacificorp*, 100 Or.App. 79, 784 P.2d 1112, 1117 (1990).

nied the landowners' application for attorney fees, but ruled that they were entitled to recover their costs incurred in defending against the condemnation. In their cross-appeal, the landowners claim that W.S. 16–7–116 (Oct.1982 Repl.) entitles them to recover their reasonable attorney fees.[8] The landowners argue that under the statute a final judgment in their favor entitles them to recover their litigation expenses.

■ In a Nebraska case involving essentially the same statutory framework, landowners attempted to recover their attorney fees under a state statute. The Nebraska Supreme Court held that the district court's order did not prevent a later condemnation of the land. *Sorensen v. Lower Niobrara Natural Resources District*, 215 Neb. 681, 340 N.W.2d 164 (1983). The court noted that if the condemnor has the right to reinstitute the proceedings, there is no final judgment, and denied the landowners their attorney fees. In other words, attorney fees are allowable only when the "final judgment prevents the agency from acquiring the property by any condemnation proceeding or the agency abandons all attempts to acquire the property by condemnation." *Id.*, 215 Neb. at 686, 340 N.W.2d at 167.

■ We agree with the Nebraska court's resolution. Here, the district court has not issued a final judgment that the land can never be acquired by condemnation. The district court has instead ruled that the land may be condemned if the town properly follows the requirements set out in W.S. 1–26–504(a). The town has not abandoned the condemnation; instead, it has filed a second action. Thus, we affirm the district court's ruling denying the landowners their attorney fees.

URBIGKIT, C.J., filed a dissenting opinion.

URBIGKIT, Chief Justice, dissenting.

In initial analysis, my strongest disagreement with the decision of the majority arises from this court's basic misunderstanding and misapplication of the separation of powers concept. *See Billis v. State*, 800 P.2d 401 (Wyo.1990), Urbigkit, Justice, dissenting and Wyo. Const. art. 2.

Here, instead of relinquishing judicial authority to an executive agency, we undermine executive discretionary authority by judicially undertaking to determine need and necessity for a town to have an adequate airport as a constituent of the municipality and its community life in this last decade before the twenty-first century arrives. Unfortunately, we not only undermine authority of the local government, but also achieve an improvident result in hindering efforts directed toward self-improvement of the community. *See* Morrison, *A Non–Power Look at Separation of Powers*, 79 Geo.L.J. 281 (1990). Not without note is the fact that this decision deprecates constitutional concepts by restricting the right of eminent domain for general benefit of a community.[1]

---

**8.** W.S. 16–7–116 is part of the "Wyoming Relocation Assistance Act of 1973" found at §§ 16–7–101 through 16–7–121. This portion of the act involves condemnations funded with federal financing and is patterned after 42 U.S.C. 4654(a) (1982). Here, the FAA is funding a large portion of the costs associated with the extension of the Wheatland airport. The statute provides that

> [i]f a condemnation proceeding is instituted by an agency to acquire real property for a purpose as set forth in W.S. 16–7–115, and the final judgment is that the real property cannot be acquired by condemnation or that the proceeding is abandoned, the owner of any right, title or interest in the real property shall be paid a sum which will, in the opinion of the court, reimburse the owner for his reasonable attorney, appraisal and engineering fees actu-

ally incurred because of the condemnation proceedings. The award of the sums will be paid by the agency which sought to condemn the property.

**1.** There is much about the Wyoming Eminent Domain Act of 1981, now W.S. 1–26–501 through 1–26–817, that I did then and do now question on both a constitutional and practical basis, including incursion by the legislature into judicial authority to adopt rules of procedure for the court and incursion by the judiciary into the executive responsibility of determination of need and welfare, but the law can be properly applied to serve its constitutional purpose to promote the welfare of citizens of the state. Conversely, it can be misapplied to hinder and deter the state's growth and development. *See* Comment, *Wyoming Eminent Domain Act: Comment on the Act and Rule 71.1 of the Wyo-*

This court skirted by the critical basic issue of eminent domain in *Board of County Com'rs of Johnson County v. Atter*, 734 P.2d 549 (Wyo.1987), but is now directly called to face the constitutional question: Are the determinate factors of eminent domain to establish the need and necessity of the community a decisional factor of the executive branch of government to be reversible by the judiciary only for abuse of discretion when arbitrary or capricious or do we do what is asserted by the majority here, analyze the evidence to evaluate factually in Cheyenne, Wyoming whether Wheatland, Wyoming deserves an adequate airfield which becomes judicial legislating as a process of government?

I would start with the Wyoming Constitution. In the 1890 session when the Constitution was written, eminent domain became a recurrent topic.[2] Since that time, airport construction developed to be a topic of public concern sufficient to result in the passage of a constitutional amendment in 1947:

> The provisions of section 6 of article XVI of this constitution prohibiting the state from engaging in any work of internal improvement unless authorized by a two-thirds vote of the people, shall not apply to or affect the construction, maintenance or improvement of public airports, aircraft landing strips and related facilities but the legislature shall have power to provide for the construction, maintenance and improvement of public airports, aircraft landing strips and related facilities, in whole or in part by the state, either directly or by extending aid to its political subdivisions and, notwithstanding said inhibition as to works of internal improvement, whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in the aid of their completion and maintenance.

Wyo. Const. art. 16, § 11.

In clear compliance with that constitutional policy and message, we are here presented an effort by a town to extend its 4,200 foot runway at its municipal airport by 2,000 feet to meet *minimum federal safety standards*. The real action in this case is the desire of contestants to have the airport relocated and rebuilt on someone else's property. *There is no realistic conflict in trial evidence denying lack of safety in the facility as presently usable.* Likewise, there is no real conflict that moving the airport would involve similar problems of imposition on irrigated land, a question of further travel, and a probable double cost with final completion, which would involve both reconstruction and moving existent hangar facilities, both public and private.

If we look at the record, the issues are improvement/extension to obtain a "safe" facility, move at a much higher cost to another location or lose available state and federal funding and retain an unsafe landing strip until people, which will inevitably occur, are killed in airplane crashes at the airport.

The technical detail of safety is unchallenged by expert testimony in this record.[3]

*ming Rules of Civil Procedure,* 18 Land & Water L.Rev. 739 (1983) and S.F. No. 037, 46th Leg., Digest of Senate Journal 59 (1981). Even a libertarian, a judicial liberal or just a plain humanist can recognize that community needs require individual sacrifice whether the burden is equalized or adequate compensation is provided for unequal contribution. Effective processes for eminent domain are essential for the maintenance of fairness in representative government and eminent domain is indispensable in order for organized society to acquire the requirements to operate and even more so in the high speed industrial world.

2. Eminent domain is addressed in five sections of the Wyoming Constitution: art. 1, § 3—declaration of rights; art. 1, § 32—compensation for property taken; art. 10, §§ 9 and 14—corporations; and art. 13, § 5—acquisition of water rights of municipalities. *See also* Annals of the Wyoming Constitution.

3. Witnesses called by appellee to contend for moving the airport and object to present location extension included generally involved landowners and two county commissioners who essentially professed that moving was preferable.

Since we seem to be dealing in a discussion of the evidence and the facts about the Wheatland airport's 4,200 foot runway, some consideration of what are realistically undisputed technical details is informative.[4] The record reflects that for at least a decade, effort to improve the airport had been underway and within the documented material is a consulting engineer study dated June 28, 1976, which considered five questions: (1) taking of agricultural lands; (2) access to the north and south due to closing the road east of the airport; (3) safety; (4) commercial air service; and (5) cross wind runway. The study then concluded first with regard to safety and then in general:

> 3. *Safety.* Development and expansion would enhance safety of air operations. Lengthening the runway would allow take-offs and landings to occur farther to the east and would allow operations over populated areas to occur at a higher level. Proposed development would allow for all aspects of aviation to occur within acceptable safe limits.

> \*     \*     \*     \*     \*     \*

The above were the major questions which were brought out in the Public Hearing and subsequent written input. We feel, as was stated previously, that the present site has the capability for expansion to provide a good, safe facility for the needs of the community. There does not appear to be sufficient negative environmental impact to justify an alternate site.

Regarding existing sufficiency, a staff civil engineer of the Federal Aviation Administration wrote to the town under date of May 4, 1987, stating:

> We understand a question has been raised on the need for expansion and improvements to the Phifer Field Airport at Wheatland. The current facilities include a $75' \times 4200'$ runway which would satisfy the interim dimensions in the initial stage of developing an airport. The elevation of the airport dictates a runway $75' \times 5,500'$ [overwritten as 4,500'] as a minimum for the Wheatland area.

> The clear zone to the west end of the runway does not satisfy FAA criteria and has caused the displacement of the runway by 305 feet. Facilities on the Fair Grounds are obstructions to the approach to runway end 8. The county road east of the airport is an obstruction to the app[ro]ach to Runway 26, which in turn is displaced by 300'. This has reduced the effective runway length to less than 4,000' which is a real concern to the FAA and the using aircraft owners.

> The FAA, therefore, feels that it is imperative that the airport be expanded and improved to adequately satisfy the current demand.

> As an added incentive to expedite actions in this matter, the FAA must have a grant agreement on this project by August 15, 1987, or the Federal funds will be made available to other Wyoming locations.

The subject was further reviewed in a letter of June 5, 1987, addressed to one of

---

It is completely accurate to characterize the extension controversy and objection by characterization of the protestants: "We are not concerned about safety but if you are, build on the land of someone else where it is not on my property or crosses our road or ditch." This was in reality a choice of sites controversy. *Huntington Park Redevelopment Agency v. Duncan,* 142 Cal.App.3d 17, 190 Cal.Rptr. 744, *cert. denied* 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983). *Cf. Redevelopment Agency v. Norm's Slauson,* 173 Cal.App.3d 1121, 219 Cal. Rptr. 365 (1985).

4. Wheatland's Phifer Field Airport is named for a progressive resident in earlier time who, with two other community spirited citizens, donated the land for the present airport as pioneers for

promoting community benefit. It is an anomaly of note that progressive safety for that Phifer airfield is now seriously questioned within the community. It is more absurd to suggest that the use of the Guernsey, Wyoming airfield some twenty-eight miles away, the Cheyenne airport some seventy miles away, or the Denver, Colorado airport 100 miles further is sufficient to sustain the progressive intent and effort of the Platte County and Wheatland community. It is only the first step in discerning that communities of this character have no justified economic vitality for the next century. I reject both that thesis and the supposition that a safe airport is unnecessary for the county seat of Platte County.

the affected landowners, which stated in pertinent part:

> Under FAA criteria, the present runway is inadequate in length and results in safety problems to aircraft which operate there. For this reason, we placed a high priority for funding a project to extend the runway. The project is also included in the State of Wyoming's Airport System Plan and is high on their priority list.

The Wyoming Aeronautics Commission addressed the same landowner on December 9, 1987, stating in part:

> I wish to inform you that the Aeronautics Commissioners have been aware of the desire by the town of Wheatland to improve its airport since the start of any process in this direction. We did assist the town of Wheatland in matching federal (FAA) funds granted for completion of a master plan for the airport which designated a number of alternatives for improvement of the Wheatland Airport. It is our desire, along with the town and the federal aviation administration, to improve the capabilities of Phifer Field. Some of the major reasons for this are:

> 1. The existing runway's useful length of 3900 feet is basically inadequate for accelerate-stop distances figured for most light twin-engine aircraft. Many of these types of aircraft currently utilize the airport including those operated by the Commission and the Wyoming Highway Department. Therefore, I believe, that "3200 feet" is sufficient for the largest aircraft using the airport is not correct.

> 2. In regard to the economic benefit of an airport such as Wheatland's (as shown in the Wyoming State Airport System Plan Update, Vol. IV, Estimating the Economic Benefits of Airports: A Users Guide), there is substantial evidence to indicate that a municipality can, and usually does, derive economic benefit from aircraft using their airport. This consists of direct (such as fuel sales) and indirect (motel, restaurant, store sales to pilots/passengers) benefits.

Another consulting engineering firm, on January 21, 1988, related to meeting FAA runway standards:

> As discussed above, *FAA minimum standards require* a 5900 foot runway length to accommodate the class of aircraft presently using the airport on a frequent basis. FAA told the Town that the agency would support local efforts to lengthen the runway to either a Basic Utility Stage I (5000 feet) or Stage II (5900 feet). Town officials recognized that constructing the less expensive 5000 foot length would leave their facility below FAA minimum standards. They felt it in the best interest of the community to construct a facility that adequately accommodated both FAA minimum standards and the aircraft using the airport.

(Emphasis in original.)

Another document, dated January 22, 1988, from the Federal Aviation Administration to the Wyoming Aeronautics Commission obviously responding to a landowner letter to Congressman Cheney (now United States Secretary of Defense), stated in part:

> We would add some comments in reference to statements relative to FAA involvement in the proposed project. The FAA is very interested in the improvements of airports in Wyoming and the other 50 states. That interest can result in Federal dollars in airport improvements only when a location such as Wheatland can qualify within the FAA priority system to justify those Federal dollars.

> There are many similar airports in Wyoming competing for the limited Federal funds available for Wyoming airport improvements. The Wheatland Airport has shown a justifiable need and is high enough in the priority system to be considered for Federal funding.

> The closing of the county road will require some extra travel in the farming operation; however, the project will include work on the irrigation ditch where it crosses the extended runway to assure continued water delivery on either side of the runway. There should be little effect

on the availability of water to the 520 acres located below the extended runway.

The subject was considered by another exhibit in this record from the Town of Wheatland addressed to the Wyoming Aeronautics Commission of January 19, 1988:

Missouri Basin's interest in expanding Phifer Field was and continues to be a safety issue with their own pilots. They have expressed concern solely due to safety problems with their current plane "King Air".

The statement in "their interest due to their desire to purchase a corporate jet" is not true. Also, they are not by any means the single user at Phifer Field. Our Platte County Memorial Hospital has several out-of-town physicians who make regular trips in and out of Wheatland to see patients and perform operations.

Flight For Life services from Casper has also been a user at our Phifer Field. The Town of Wheatland began this project mainly from a safety viewpoint given our traffic flow at the airport. I sincerely hope we can continue with this greatly needed project.

This record also tells that in pursuit of the effort to improve the airport, a grant agreement was executed with the Federal Aviation Administration, dated August 25, 1987, and an agreement with the Wyoming Aeronautics Commission for application and use of grant funds dated August 23, 1988.

In simplest terms, the present Wheatland airport runway does not meet minimum federal safety standards for its class. (Testimony of the Wheatland city clerk and testimony of the FAA's civil engineer indicated that the length at present was 4,200 feet and the required standard is at least 5,000 feet.) All of this provides a status of the factually unsafe airport and community conflict basically from affected landowners about who should pay the price for general benefit of land for public use. The issue moves to become executive agency discretional authority, fact finding preeminence,

or primacy of judicial review in considering a test for assessment of a public instrumentality's right to acquire a project for public usage.

Both the district court and now this tribunal convert a discretional decision into a judicially weighing test for factual analysis of the decision of an administrative agency. Since, philosophically, I lean in favor of public safety against private rights to property, the decision in both tribunals is just wrong. Far more pervasive in this case is the utilization of the wrong standard for determination and the wrong test for review which results in interjecting the judiciary into an administrative proceeding activity involving resolution of a discretional decision. This judicial adventure violates . the Wyoming Constitution separation of powers by injecting the judiciary into supervision of executive decisions for conduct of government.

The present state of this litigation has nothing to do with an adequate award of damages to the private citizen as required by Wyo. Const. art. 1, § 32. Most of the complaints recited in resistance to the airport extension for safety clearance addressed anticipated damages from land use loss. Those subjects would remain for the second stage of the eminent domain proceeding and in no perspective are now presented. W.S. 1–26–701 through 1–26–713. If there are significant damages, significant recovery should properly be awarded. Comment, *Wyoming Eminent Domain Act: Comment on the Act and Rule 71.1 of the Wyoming Rules of Civil Procedure*, 18 Land & Water L.Rev. 739 (1983). *See also Coronado Oil Co. v. Grieves*, 642 P.2d 423 (Wyo.1982); Wyo. Const. art. 1, §§ 32 and 33; and Comment, *The Use of Opinion Testimony in Valuing Real Property in an Eminent Domain Suit*, 19 Land & Water L.Rev. 43 (1984). The constitutional right to obtain property for public safety—as in this case for a safe airport—is not a conflicting principle with entitlement under the Wyoming Constitution to obtain fair compensation when private property is taken for public use.

Specifically, I perceive that W.S. 1–26–504 addresses a discretional responsibility

of the acquiring governmental entity and the test then for the judiciary is to apply the administrative abuse of discretion standard. It is patently disingenuous to say that the airport extension was not "needed" when significant safety factors existed.[5] *Cf. United States v. 82.46 Acres of Land, More or Less, Situate in Carbon County, Wyoming,* 691 F.2d 474 (10th Cir. 1982) and *Wilson v. United States,* 350 F.2d 901 (10th Cir.1965).

It is equally invalid to consider that safety is not a proper concern of the town or that the availability of a convenient airport to a town the size and character of Wheatland is not a significant public purpose. Also, farsighted and businesslike approaches for public benefit cannot realistically be critiqued as abused discretion. *Port of Umatilla v. Richmond,* 212 Or. 596, 321 P.2d 338 (1958). The safety concern which extends to need was unquestionably established and the choice of location, either of which was possible if sufficient money was to be realistically available, becomes a governmental political decision. I cannot and will not weigh safety against appropriate self-interest of individual landowners or, from Cheyenne, determine whose land should be used—whether about sixty acres of which thirty or forty acres are irrigated land for an extension or an entire 360 acres required for a new facility. *Huntington Park Redevelopment Agency v. Duncan,* 142 Cal.App.3d 17, 190 Cal.Rptr. 744, *cert. denied* 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983). This is not a gross abuse of discretion case. *Redevelopment Agency v. Norm's Slauson,* 173 Cal.App.3d 1121, 219 Cal.Rptr. 365 (1985).

Additionally, this is not a necessity case since alternative sites create the real issue. Safety criteria demonstrating necessity of

improvement was not seriously in factual question. *Cf. City of Missoula v. Mountain Water Co.,* 228 Mont. 404, 743 P.2d 590 (1987), the taking of a private water company. The deeply entrenched governmental standard which has since been generally and consistently applied is well-stated in one of the earlier texts:

> Some courts have held that, in order to uphold an exercise of the power of eminent domain, a necessity must exist for its exercise, in order to accomplish the purpose sought, and that this question of necessity is in some way an element in determining whether the taking is for public use. Thus it is argued that a hotel or theater is not a public use within the meaning of the constitution, because the public can be accommodated in those respects without resorting to the power of eminent domain. Nearly all the cases, however, hold that the question of necessity is distinct from the question of public use, and that the former question is exclusively for the legislature. The necessity, expediency or propriety of exercising the power of eminent domain, and the extent and manner of its exercise, are questions of general public policy and belong to the legislative department of the government. They have nothing to do with the question of what constitutes a public use.

1 J. Lewis, Eminent Domain § 255 at 502–503 (3d ed. 1909) (footnotes omitted).

My concern in this case is not limited to anxiety about the well being and future health of the Wheatland community; it is expanded in consideration of separation of power.[6] Certain political decisions should be executive and I cannot constitutionally accept legislative relegation to judicial resolution. Wyo. Const. art. 2 should not be so casually disregarded. "The right of emi-

---

**5.** If we apply either the rule of probabilities or the infinite nature of successive numbers included within the scientific concept of chaos, we learn that what can happen will happen. An unsafe airfield, if continued in use, will inevitably claim lives in some future time. The only fact which is now indeterminate is whether the use is totally discontinued and, if not, who is killed and when. The first occurrence could be some casual reader of this opinion who happens

to fly into Wheatland on that inevitably scheduled future day.

**6.** See, for example, *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) and Smith, *Justice Antonin Scalia and the Institutions of American Government,* 25 Wake Forest L.Rev. 783, 788 (1990).

I would join with what Justice Scalia said in dissent in *Morrison,* 108 S.Ct. at 2623 as address-

nent domain is an inherent, sovereign power," and in exercise, is found in this case as "legislative in character." *State ex rel. State Highway Com'n v. Meeker*, 75 Wyo. 210, 218, 294 P.2d 603, 606 (1956) and 2 J. Lewis, Eminent Domain § 597 at 1056 (3d ed. 1909).

Specifically addressing this case, the determination of need should be executive by legislative delegation. *Meeker*, 294 P.2d 603. Reversal in the judicial process should then only occur with application of the administrative review standards when the local government in this case—the city council—acts in a fashion which is arbitrary and capricious. W.S. 16–3–114(c) controls decision by this court and provides the rule of review for this court.[7]

Since a "safe" airport is an unchallenged governmental obligation, the only remaining question for assessment is whether the action of the city council is arbitrary and capricious or an abuse of discretion under the statutory review criteria. To seek a safer airport cannot, within the criteria of logic and the English language, be an abuse of discretion. Analysis should be confined to an ascertainment of whether the action was arbitrary and capricious. Lacking proof that the Town of Wheatland

ing separation of powers and allocation of powers:

Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf.

I am not so sure that the issue comes here so much as a wolf, but now further nourished by this opinion, grows to achieve fully developed status for destructive capability. *See* Schwartz, *Curiouser and Curiouser: The Supreme Court's Separation of Powers Wonderland*, 65 Notre Dame L.Rev. 587 (1990). *Cf. I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); and finally *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714, *judgment aff'd* 873 F.2d 1446 (8th Cir.), *cert. denied* 490 U.S. 1073, 109 S.Ct. 2083, 104 L.Ed.2d 646 (1989).

7. W.S. 16–3–114(c) states:

To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret

has no right to a safe airport, the inquiry is left whether another location is justifiable. That can only be an administrative decision. *Knight v. Environmental Quality Council*, 805 P.2d 268 (Wyo.1991) In making that decision, abuse of discretion is a question of law. *Emerald People's Utility Dist. v. Pacificorp*, 100 Or.App. 79, 784 P.2d 1112, 1117 (1990); *Port of Umatilla*, 321 P.2d at 351. *See also Application of Northern Utilities Co.*, 70 Wyo. 225, 255, 247 P.2d 767 (1952).

The recognized authority on eminent domain, 1A Nichols on Eminent Domain § 4.11[2] at 4–215 (rev. 3d ed. 1990) (quoting *Boswell v. Prince George's County*, 273 Md. 522, 523–24, 330 A.2d 663 (1975) and *Basin Elec. Power Co-op. v. Payne*, 298 N.W.2d 385 (S.D.1980)), addresses the oft found litigated subject and its resolution:

" 'Landowners when faced with a proposed acquisition of their land for public improvements, whether by way of easement or in fee simple, have often suggested to the courts that they saw a better way to do the improvement than that proposed by the condemning authority. * * * ' "

\* \* \* \* \* \*

constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

"The issue before the trial court on such proceeding is the question of fraud, bad faith, or abuse of discretion by the condemnor, the presence of any one of which could vitiate the taking."

That authoritative resource then considers the logical placement of discretion within this consideration of judicial review of administrative decisions relative to eminent domain exercise:

"'A broad discretion is necessarily vested in those to whom the power of eminent domain is delegated, in determining what property is necessary for the public purpose, with respect to the particular route, line, or location of the proposed work or improvement, and the general rule is that the courts will not disturb their action in the absence of fraud, bad faith, or gross abuse of discretion.'"

1A Nichols on Eminent Domain, *supra*, at 4–215 (quoting 26 Am.Jur.2d *Eminent Domain* § 113 (1966)).

In monumental mistake, the first error of this majority is in converting the agency review into a plenary trial analysis. We should confine *Atter*, 734 P.2d 549 very strictly to its analysis of the decisional process encompassing agency review standards. On that basis, I was able to concur in *Atter* and now properly apply its confined approach to realize a constitutional application within Wyo. Const. art. 2 for the present eminent domain statute. Consequently, we are not presented a sufficiency of the evidence initial concept, but arbitrary and capricious examination for the administrative agency under agency review standards. *Cf. United States v. Certain Parcels of Land in City of Cheyenne, Laramie County, Wyoming*, 141 F.Supp. 300 (D.Wyo.1956).

Close examination of W.S. 1–26–504 reveals two pathways to decision within the first phase, right to exercise the process provided. First, if the decision was initiated by a "state agency" after a hearing which determined public interest and necessity, the decision is pro forma valid. For other agencies of Wyoming government, submission of evidence is required at the court hearing of that agency's decision based upon the stated criteria: (a) public interest; (b) compatible use, greatest public good and least private injury; and (c) necessity. What we are then called to decide by this case is whether the decisional process is vested in the governmental agency controlled or supervised by *judicial rules of review* or whether the court becomes the political agency of *initial decision*. 1A Nichols on Eminent Domain, *supra*, at 4–237. *Cf. Knight*, 805 P.2d 268 (Wyo.1991). The majority of this court undertakes to make the political/governmental decisions as a *nisi prius* tribunal, while I consider the judicial responsibility to be vested by administrative agency review. Unfortunately, this majority is wrong in standard of review analysis for the district court and also wrong factually when it attempts to render its administrative decision as an executive function relating to a political decision of government involving the welfare of a community.

We sacrifice the community interest in bland or blind misconstruction of the eminent domain constitutional function which is first, acquisition of private property for public good, and second, adequate compensation to the owner of that private property.